CHRISTIAN, J.
The plaintiff in error was indicted in the county court of Augusta county for lewdly associating *and cohabiting with Mahala Miller. He was found guilty and a fine assessed against him to the 'amount of $500. The case was taken up on writ of error to the circuit court, which affirmed the judgment of the county court, and to this latter judgment of the circuit court a writ of error was awarded by one of the judges of this court. The bill of exceptions taken on the trial, in the county court, which brings up before this court the only question we have to determine, is in these words:
“Be it remembered, that on the trial of the indictment in this case, the Commonwealth, to sustain the issue on her part, proved to the jurj>- that the defendant, Andrew Kinney, and a certain Mahala Miller, on the 1st day of January, 1877, and from that time to the 27th day of August, 1877, in the county of Augusta and state of Virginia, did live and associate together as man and wife; that said Andrew Kinney is a negro, and said Mahala Miller a white woman, and that in November, 1874, they, as citizens of the state of Virginia, regularly domiciled in the county of Augusta, left their own state for the purpose of being married in the District of Columbia, and in ten days thereafter returned to this state to live, and have since lived together as man and wife in said county of Augusta.”
The defendant, to sustain the issue on his part, proved that he and the said Mahala Miller were married in the District pf Columbia on the 4th day of November, 1874, in accordance with the laws of said district.
Whereupon the counsel for the'defendant moved the court to instruct the jury as follows. that is to say: that under the circumstances proven, the marriage of Andrew Kinnejr and Mahala Miller, in the District of Columbia, on the 4th day of November, 1874, is valid and a bar to this prosecution, and that they must find a verdict of acquittal. But the court refused to give the said instruction to the jury, and instructed the jury as follows: *“That the said marriage of the defendant and said Mahala Miller was, under the circumstances proven, but a vain and futile attempt to evade the laws of Virginia, and override her well known public policy, and is therefore no bar to this prosecution; to which opinion and action of the court, in refusing the said instruction asked for by the counsel for the defendant, and in giving the said instruction given by the court, the defendant, by his counsel, excepts, and tenders this his bill of exceptions, which he prays may be signed, sealed and made a part of the record in this case.”
The sole question submitted by this bill of exceptions for the adjudication of this court is, Whether the alleged marriage celebrated in the District of Columbia, “in accordance with the laws of said district,” as certified in the certificate of facts, is a bar to this prosecution? It is conceded that a marriage in this state between a white person and a negro is void. It is not only prohibited by the statute law, but penalties are imposed for its violation. The 1st section of ch. 105, Code 1873, provides that “all marriages between a white person and a negro, and all marriages which are prohibited by law on account of either of the parties having a former wife or *285 husband then living, shall be absolutely void without any decree of divorce or other legal process.” In the same section other marriages prohibited by law therein mentioned, are voidable only — that is, declared to be void only from the time they shall be’ so declared by decree of divorce or nullity. These are cases of marriages within the prohibited degrees of consanguinity or affinity, or where either party was insane or incapable from physical causes. Such marriages are void when declared to be void by decree of divorce or nullity, or when the parties are convicted under the third section of chapter 192, which denounces certain penalties against marriages of parties within the prescribed degrees of consanguinity or affinity. *But marriage between a white person and a negro is declared by statute to be absolutely void without any decree of divorce of other legal process. If, therefore, the marriage had been celebrated in this state between Andrew Kinney, who is a negro, and Mahala Miller, who is a white woman, no matter by what ceremonies or solemnities, such marriage would have been the merest nullity, and the parties must have been regarded, under our laws, as lewdly associating and cohabiting together, and obnoxious to the penalties denounced by our statute against this gross offence.
Does the marriage of the parties in the District of Columbia, where marriages between white persons and negroes are not prohibited, present a bar to this prosecution and put the parties on any different footing when arraigned before our tribunals for a violation of the laws of this state? It is admitted that Andrew Kinney and Mahala Miller h-'cl their domicile in Augusta county, in this state; that they remained out of the state only ten days after their marriage, and returned here, and that this county is still their domicile.
It is plain to be gathered from the whole record, if not indeed admitted, that these parties, knowing they could enter into no valid marriage contract in this state, went to the city of Washington for the purpose of evading the statute law of this state; were there married, and in a few days returned to this state. They never changed nor designed to change their domicile. It was here then; it is here now.
The important question, and one of first impression in this state is: Does the marriage in the District of Columbia, made in fraudem legis of this state, protect the parties in a prosecution in this state for a violation of its penal laws in this most important and vital branch of criminal jurisprudence, affecting the moral well being *and social order of this state? Must the lex loci contractus or the lex domicilii prevail?
There can be no doubt as to the power of every country to make laws regulating the marriage of its own subjects; to declare who may marry, how they may marry, and what shall be the legal consequences of their marrying. The right to regulate the institution of marriage; to classify the parties and persons who may lawfully marry; to dissolve the relation by divorce; and to impose such restraints upon the relation as the laws of God, and the laws of propriety, morality and social order demand, has been exercised by all civilized governments in all ages of the world.
It is insisted, however, by the learned counsel for the plaintiff in error, in the ingenious and able argument which he addressed to this court, that conceding the power of every state and country to pass such laws, yet they never act extra territorial, but must be confined, with rare- exceptions, to such marriages as are contracted and consummated within the state where they are prohibited. lie invokes for his client in this case the rule laid down by jurists and text-writers, that “a marriage valid where celebrated is good everywhere.”
This is undoubtedly the general rule. But there are certain exceptions to this general rule, and while in its application and the affirmance of certain exceptions thereto, there was for a long time much confusion in the authorities and conflict in the cases, I think it may now be affirmed that there are exceptions to this general rule as well established and authoritatively settled as the rule itself.
Mr. Justice Story, in his valuable work on the Conflict of Laws, § 113, probably lays down the general rule contended for more strongly than any other modern author. He says: “The general principle certainly is, that between persons sui juris marriage is to be decided *by the law of the place where celebrated. If valid there it is valid everywhere: Tt. has a legal ubiquity of obligation. If invalid there it is equally invalid everywhere.” But he immediately adds in the following sections (113a) : “The most prominent, if not the only known exceptions to the rule, are those marriages involving polygamy and ■ incest, those positively prohibited by the public laws of a country from motives of policy, and those celebrated in foreign countries by subjects entitling themselves under special circumstances to the benefit of the laws of their own country.”
In the comparatively recent case of Brook v. Brook, reported in 9 H. L. C. 193 (marg.), 145 (bottom), I find the most elaborate, learned and satisfactory discussion of this general rule on the subject of marriage, with the exceptions thereto, that I have seen in any of the numerous cases on the subject. The facts of that case and the principles therein declared are singularly apposite to the case in hand.
The Act of 5 and 6 William, 4, ch. 54, enacts that all marriages which should thereafter be celebrated between persons within the prohibited degrees of consanguinity or affinity, “shall be absolutely null and void to all intents and purposes whatsoever.” The marriage of a man with his wife’s sister is included in this prohibition.
William Leigh Brook, after the death of his first wife, intermarried with Mrs. Emily Armitage, the lawful sister of his former wife. The marriage was celebrated at a Lutheran church at Wansbeck, near Altona, *286 in Denmark. At the time of the Danish marriage, both Mr. Brook and Mrs. Armitage were lawfully domiciled in England, and had merely gone over to Denmark on a temporary visit. According to the laws of Denmark, where the marriage was celebrated, it was not unlawful for a man to marry his wife’s sister. In a suit among the heirs of Brook, Vice-Chancellor Stuart, with whom *sat Mr. Justice Cresswell, were of opinion, and so declared, that the marriage in Denmark was, by the laws of England, invalid. The case was carried up to the house of lords. It was 'there considered with that great deliberation and carefulness characteristic of that great tribunal. Opinions were delivered by the lord chancellor (Lord Campbell), Lord Cranworth, Lord St. Leonards, and Lord Wensleydale. After reviewing a number of English and some American cases, the lord chancellor said: “They (the appellants) rest their case entirely upon the fact that the marriage was celebrated in a foreign country, where the marriage of a man with the sister of his deceased wife is permitted.” There can be no doubt of the general rule that a foreign marriage, valid according to the law of a country where it is celebrated, is valid everywhere. But while the forms of entering into the contract of marriage are to be regulated by the lex loci contractus, the law of the country in which it is celebrated, the essentials of the contract depend upon the lex domicilii, the law of the country in which the parties are domiciled at the time of the marriage, and in which the matrimonial residence is contemplated. Although the forms of celebrating the foreign marriage may be different from those required by the law of the country of domicile, the marriage may be good everywhere. But if the contract of marriage is such inessentials as to be contrary to the law of the country of domicile, and it is declared void by that law, it is to be regarded as yoid in the country of domicile, though not -contrary to the. law of the country in which it was celebrated. This qualification upon the general rule “that a marriage valid where celebrated is good everywhere,” he adds, is to be found in the writings of many eminent jurists who have discussed the subject, among whom he mentions Huberus and Story.
Lord Cranworth states that the marriage referred to in *the general rule is not a marriage prohibited by the laws of the country to which' the parties contracting matrimony belong. The other lords, as well as Lord Cranworth, concur fully in the opinion of the lord chancellor.
Whatever conflict of authority there may have been on this subject, it may now be affirmed, since the decision of Brook v. Brook, that in England, a marriage prohibited bylaw in that country, .between parties domiciled there, and declared by act of parliament to be absolutely void, is invalid there no matter where celebrated. In this country the same doctrine is affirmed in North Carolina, Louisiana and Tennessee. See Williams v. Oates’ ex’or, 5 Ired. R. 535; State v. Kennedy, 76 North Car. 251; State v. Ross, 77 North Car. S. C. Central Law Journal, April. 77; 10 La. An. 411, Dupre v. Boulad’s ex’or.
Whenever the question has arisen in the southern states, it has been held that a marriage between a white person and a negro, although the marriage be celebrated in a state where such marriages are not prohibited, is void in the state of the domicile, and when they go to another state temporarily, and for the purpose of evading the law, and return to their domicile, such marriage is no-bar to a criminal prosecution. And such is the law of this state. It is now so declared by statute. See Sess. Acts of 1877-8. The statute, however, was passed after the marriage of the parties in'this case. But without such statute, the marriage was a nullity. It was a marriage prohibited and declared “absolutely void.” It was contrary to the declared public law, founded upon motives of public policy — a public policy affirmed for more than a century; and one upon which social order, public morality, and the best interests of both races depend. This unmistakable policy of the legislature, founded, I think, on wisdom and the moral development of both races, has been shown by not only declaring marriages *between whites and negroes absolutely void, but by prohibiting and punishing such unnatural alliances with severe penalties. The laws enacted to further and uphold this declared policy would be futile and a dead letter if in fraud of these salutary enactments, both races might, by stepping across an imaginary line, bid defiance to the law, by immediately returning and insisting that the marriage celebrated in another state or country, should be recognized as lawful, though denounced by the public law of the domicile as unlawful and absolutely void. No state will permit its citizens to violate its laws by such evasions. But the law of the domicile will govern in such case, and when they return, they will be subject to all its penalties, as if such marriage had been celebrated within the state whose public law they have set at defiance.
There is one American case which is directly opposed to the principles herein declared, the facts of which are precisely the same as in the case before us. It is the case of Medway v. Needham, 16 Mass. R. 157, which was strongly relied on by the learned counsel for the plaintiff in error as authority to govern this case. But I think that case is not supported by authority nor grounded on any sound principles of law. That was the case of a,marriage between a white person and a negro. The parties were domiciled in Massachusetts, whose laws at that time prohibited such marriages. They went into Rhode Island, where such marriages were lawful, were there married, and returned to Massachusetts. The supreme court of that state held the marriage to be valid, and declared, in an elaborate opinion, that “a marriage which is good by the laws of the country where it is celebrated, is valid in every other country; and although it should *287 appear that the parties went into another state to contract such marriage, with a view to evade the laws of their own country, the marriage in the foreign country will ^nevertheless be valid in the country in which the parlies live.”
In commenting on this case, the lord chancellor, in Brook v. Brook, supra (319), says: “1 cannot think it is entitled to much weight, for the learned judge admitted that he was overruling the doctrine of Huberus and other eminent jurists; he relied on decisions in which the forms only of celebrating the marriage in the country of celebration and the country of domicile were different; and he took the distinction between cases where the absolute prohibition of marriage is forbidden on motives of policy, and where the marriage is prohibited as being contrary to religion on the ground of incest. I, myself, must deny the distinction. If a marriage is absolutely prohibited in any country as being contrary to public policy and leading to social evils, I think that the domiciled inhabitants of that country cannot be permitted, by passing the frontier and entering another slate in which the marriage is not prohibited, to celebrate a marriage forbidden by their own state, and immediately returning to their own state, to insist on their marriage being recognized as lawful.”
Lord Cranworth, referring to the same case, said: “I also concur entirely with my noble and learned friend that the American decision of Medway v. Needham, cannot be treated as proceeding on sound principles of law.
‘‘The province or state of Massachusetts positively prohibited by its laws, as contrary to public policy, the marriage of a mulatto with a white woman; and on one of the grounds, pointed out by Mr. Story, such a marriage ought certainly to have been held void in Massachusetts, though celebrated in another province where such marriages were lawful.”
With such condemnation, from so high a source, of this decision as authority, and when it is opposed by the decisions of our sister southern states above referred to, and contrary *to sound principles of law, I think, though a «ase exactly in point upon its facts, it can have but little weight in forming our judicial determination of the question before us in this case.
There is another American case also relied on by the counsel for the plaintiff in error for the doctrine that “a marriage valid where celebrated is valid everywhere.” It is a Kentucky case, Stevenson v. Gray, reported in 17 B. Monr. R. 193. That was a marriage between a nephew and his uncle’s wife. Such a marriage was prohibited in Kentucky, but not in Tennessee. The parties went into Tennessee, and were there married and returned to Kentucky. It was held that the marriage was valid in Kentucky. But it is to be noted that such marriages are not declared by the Kentucky statute absolutely void, but voidable only — that is, to be avoided by judgment of a district court or court of quarterly sessions. The reasoning of the judge who delivered the opinion of the court in that case, shows that he treats the case of a marriage voidable only, and not ipso facto void. If such marriage had been declared absolutely void by the Kentucky statute, the decision of the court, no doubt, would have been different.
In the seventh edition of Story’s “Conflict of Laws.” p. 178, the editor adds a section in which he says: The limitation defined by Lord Campbell, chancellor, in Brook •</. Brook, is certainly characterized by great moderation and good sense; that while the form of the contract, the rites and ceremonies proper or indispensable for its due celebration, are to be governed by the laws of the place of the contract or of celebration, the essentials of the contract depend upon the lex domicilii, the law of the country in which the parties are domiciled at the time of the marriage, and in which the matrimonial residence is contemplated. Hence, if the incapacity of the parties is such that no marriage could be solemnized between *thcm * * * and, without changing their domicile, they go into some other country where no such limitation or restriction exists, and there enter into the formal relation with a view to return and dwell in the country in which such marriage is prohibited by positive law, it is but proper to say that a proper self-respect (of the state or government in prohibiting such a marriage) would seem to reciuire that the attempted evasion would not be allowed to prevail.
1 have thus considered, at length, the authorities, English and American, on this question, because it is one of first impression in this court, and because it is a question which materially affects public morality, social order and the best interests of both races. The public policy of this state, in preventing the intercommingling of the races by refusing to legitimate marriages between them has been illustrated by its legislature for more than a century. Every well organized society is essentially interested in the existence and harmony and decorum of all its social relations. Marriage. the most elementary and useful of all, must be regulated and controlled by the sovereign power of the state. The purity of public moyals, the moral and physical development of both races, and the highest advancement of our cherished southern civilization, under which two distinct races are to work out and accomplish the destiny to which the Almighty has assigned them on this continent — all require that they should be kept distinct and separate, and that connections and alliances so unnatural that God and nature seem to forbid them, should be prohibited by positive law, and be subject to no evasion.
Upon the whole case, I am of opinion that the marriage celebrated in the District of Columbia between Andrew Kinney and Mahala Miller, though lawful there, being positively prohibited and declared void by, *288 the statutes of this state, is invalid here, and that said marriage *was a mere evasion of the laws of this state, and cannot be pleaded in bar of a criminal prosecution here. If the parties desire to maintain the relations of man and wife, they must change their domicile and go to some state or country where the laws recognize the validity of such marriages.
Upon the whole case, I am of opinion that there is no error in the judgment of the circuit court affirming the judgment of the county court, and that both be affirmed by this court.
The other judges concurred in the opinion of CHRISTIAN, J.
Judgment affirmed.