Estate of Richard H. Stull.    Appeal of Ada Morehouse.

*Divorce—Marriage—Foreign marriage—Conflict of law—Act of March 13, 1815, 6 Sm. L. 288.*

Where a husband, after being divorced in Pennsylvania from his wife on the ground of adultery with a woman domiciled in Pennsylvania, goes into a state whose laws do not forbid marriage with a paramour, and there marries his paramour, and immediately returns to Pennsylvania where he and she live and cohabit together as man and wife until his death, she is not entitled to letters of administration, if the first wife survives.

Argued Oct. 19, 1897.   Appeal, No. 124, Oct. T., 1897, by Ada Morehouse, from decree of O. C. Washington Co., May T.,

1897, No. 27, on appeal from register of wills.   Before STER-
RETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN
and FELL, JJ.  Affirmed.  McCOLLUM, MITCHELL and FELL, JJ.,
dissent.

Appeal from register of wills refusing letters of adminis-
tration.

McILVAINE, P. J., found the facts to be as follows :

In the year 1885 Richard H. Stull, a citizen and resident of
Washington county, married Hannah Margaret Lewis.   They
had born to them one child, a son, Samuel A. Stull.   On Feb-
ruary 7, 1894, Hannah Margaret Stull, née Lewis, was divorced
from Richard H. Stull by the court of common pleas of Wash-
ington county on the grounds that he, the said Richard H. Stull,
had committed the crime of adultery with one Ada Widdup,
the appellant in this case.   On the 5th day of April, 1894,
Richard H. Stull and the said Ada Widdup were married in
Cumberland, Maryland.   They left Washington county, Penn-
sylvania, and went to Cumberland, Maryland, for the sole pur-
pose of being married and to evade, as they thought, offending
against the act of assembly of Pennsylvania, approved March 13,
1815, which prohibited their being married.   Immediately after
the marriage ceremony was performed in Cumberland they
boarded a railroad train and returned to their home in this
county and lived together as man and wife until the 11th of
June, 1895, when Richard H. Stull died.   He died testate,
making Ada Widdup the principal beneficiary of his will.
Stiers Lewis was appointed guardian of Samuel A. Stull, the
only child of Richard H. Stull and Hannah Margaret Stull,
who, on behalf of his ward, contested the probate of this will.
On December 16, 1896, after a trial in the court of common
pleas, the will was decided by this court null and void, and Ada
Widdup (who is now Mrs. Morehouse), as widow of the said
Richard H. Stull, applied for letters of administration.   Stiers
Lewis, guardian of Samuel A. Stull, the only child of Richard H.
Stull, objected to the granting of letters of administration to
Ada Widdup (now Morehouse), on the ground, inter alia, that
she was not the lawful widow of Richard H. Stull, and sug-
gested that Isaac Overholt be granted letters.   The register
refused to grant letters to Ada Widdup (now Ada Morehouse)

and granted them to Isaac Overholt. From this decree of the register, Ada Widdup (now Morehouse) appealed. Hannah Margaret Stull, née Lewis, is still living.

The court dismissed the appeal.

*Error assigned* was decree dismissing appeal.

*R. W. Irwin*, for appellant.—The act of March 13, 1815, expressly forbade Richard Stull from marrying Ada Widdup during the lifetime of his divorced wife. Since the passage of that act the question here presented has never been ruled by this court, and it must be determined upon principle and upon authority derived from decisions in sister states. We contend that as much as the marriage was valid, under the laws of the state where it was solemnized, under the law of comity between the states, and upon principles of public policy, it must be treated as valid here: Brook v. Brook, 9 H. L. Cas. 193; Van Voorhis v. Brintnall, 86 N. Y. 18; Thorp v. Thorp, 90 N. Y. 602; Moore v. Hegeman, 92 N. Y. 521; Putnam v. Putnam, 8 Pickering, 433; Medway v. Needham, 16 Mass. 157; 1 Bishop on Marriage and Divorce, sec. 348; Story on Conflict of Laws, sec. 79.

*Boyd Crumrine* with him *E. E. Crumrine*, for appellee.—The marriage set up by the claimant to letters was a fraud upon the laws and jurisprudence of Maryland, violative of the express provisions of the laws of Pennsylvania and, therefore, a valid marriage in neither state: Archer v. Dunn, 2 W. & S. 327; Wood, Bacon & Co. v. Kelso, 27 Pa. 241; Whart. Confl. of L. sec. 401.

Marriage is a contract, but is something more than a mere contract: Story, Confl. of L. sec. 108.

If it be the law of the domicil that when a married person commits adultery, and a divorce is granted therefor, the guilty party and the co-respondent are prohibited from marriage during the lifetime of the complainant, the effect of the decree shall be the same in all other countries: Story, Confl. of L. sec. 41; Bank of Augusta v. Earle, 13 Pet. 519; Phillips v. Gregg, 10 W. 158; Hill v. Hill, 42 Pa. 198; Parker's App., 44 Pa. 309; Phila. v. Williamson, 10 Phila. 176; Dorsey v. Dorsey, 7 W. 349; Colvin v. Reed, 55 Pa. 375; Reel v. Elder, 62 Pa. 308; Love v. Love, 10 Phila. 453; Platt's App., 80 Pa. 501; Ralston's App.,

93 Pa. 133.; Phila. v. Wetherby, 11 W. N. C. 154; Van Storch
v. Griffin, 71 Pa. 240; Smith v. Thornton, 5 W. N. 372; Adams
v. Adams, 2 Chest. Co. 560; Le Breton v. Nouchet, 3 Mart.
(La.) 60; White v. White, 105 Mass. 325; Hanover v. Turner,
14 Mass. 227; Medway v. Needham, 16 Mass. 157; Putman v.
Putnam, 8 Pick. 433; Com. v. Lane, 113 Mass. 458; Van Voor-
his v. Brintnall, 86 N. Y. 18; Marshall v. Marshall, 2 Hun, 238;
Ponsford v. Johnson, 2 Blatchf. C. C. 51; Williams v. Oates,
5 Ired. Law Rep. 535; State v. Kennedy, 76 N. C. 251; Pen-
negar & Haney v. State, 87 Tenn. 244; Elliott v. Elliott, 38
Md. 358; Brook v. Brook, 9 H. L. C. 193; Sussex Peerage
Case, 11 Cl. & Fin. 85.

OPINION BY MR. JUSTICE GREEN, January 3, 1898:

The question at issue in this case arises upon the application
of a woman, claiming to have been the lawful wife of the dece-
dent at the time of his death, to have letters of administration
upon his estate granted to her. The letters were refused by the
register and orphans' court on the ground that the petitioner
was not the lawful wife of the decedent and hence was not
entitled to them. Briefly the facts were that the decedent
Richard H. Stull was married to Hannah M. Lewis who still
survives. In February, 1894, the wife obtained a decree of
absolute divorce from him on the ground that he had committed
adultery with one Ada Widdup. On April 5, 1894, the dece-
dent and the said Ada Widdup, both being citizens and inhabi-
tants of Pennsylvania, went to Cumberland in the state of
Maryland, and were there united in marriage. They at once re-
turned to Pennsylvania and there lived and cohabited as man and
wife on the farm of the decedent in Washington county, until his
death, on June 11, 1895. They had no children, but there was
one child, a son, Samuel A. Stull, by the first marriage. It was
admitted and found in the court below, and is now conceded on
the argument in this Court, that the decedent and Ada Widdup,
his paramour, with whom he had committed adultery, went into
Maryland to be there married, for the express purpose of evad-
ing the law of Pennsylvania which prohibits a marriage with
the paramour during the life of the injured wife or husband.
It is also conceded that by the law of Maryland there is no such
prohibition, and that under that law the marriage was lawful.

The question arising is, was the applicant the lawful wife of the decedent at the time of his death? She subsequently married one Morehouse, and now bears his name. Our act of March 13, 1815, Purd. Dig. 688, Pl. 29, sec. 9, provides as follows : " The wife or husband who shall have been guilty of the crime of adultery, shall not marry the person with whom the said crime was committed, during the life of the former wife or husband ; but nothing herein contained shall be construed to extend to or affect, or render illegitimate, any of the children born of the body of the wife during coverture." Section 10 disables a guilty wife who after the divorce cohabits with her paramour from alienating any of her lands and tenements, and avoids such conveyances if made.

By the ninth section it will be perceived there is an absolute prohibition of any subsequent marriage between the guilty person and the paramour during the life of the former wife or husband. It forbids the marriage relation to be contracted in the most general terms. The guilty party " shall not marry the person with whom the said crime was committed." A personal incapacity to marry is imposed. The necessary meaning of this language is that they shall not marry at all, in any circumstances, or at any time, or any place, so long as the injured party is living. So far as the purpose and meaning of this statute are concerned it is of no consequence where such subsequent prohibited marriage takes place. The relation itself is absolutely prohibited, and hence is within the operative words of the statute, without any reference as to where the marriage occurs.

It is now necessary to notice the other environments which affect the case. Both the parties to the prohibited marriage were citizens of Pennsylvania, domiciled on her territory, both before and after the marriage, and were only absent long enough to have the ceremony performed. They continued to reside together in Pennsylvania until the death of the husband. The woman resides here still. She never acquired any rights as an inhabitant of the state of Maryland, and can, and does, not now claim any right of that character. She is now claiming, not only the protection of our law, but a special. privilege and right, accorded only to lawful wives under the intestate law of Pennsylvania, to wit : the right to have administration of the estate

of her alleged husband.   In this respect the case is different from many of the cases cited in the paper-books, and the difference is against her claim.   Here, she, being now and at all times a citizen of Pennsylvania, subject at all times to its laws and its policies, having committed a direct and positive violation of one of those laws which relates to, and immediately affects, the very application she now makes, solicits a decree from an orphans' court of Pennsylvania, giving her property rights and a right of administration, on the specific ground that she acquired those rights, if she acquired them at all, in consequence of a violation of the law of Pennsylvania.   And she asks this decree, as she only can ask it, by the importation and actual enforcement of the law of a foreign state, within our own territory, and in our own judicature, when that law is contrary to the express terms of our own law and contrary to the manifest and settled policy of our commonwealth.   Moreover it is expressly conceded that the parties left the territory of Pennsylvania, and entered that of Maryland, for the very purpose of evading the law of Pennsylvania which prohibited their marriage.   We do not think that any of the cases cited for the appellant contains so many elements of invalidity as this.

There is no question as to the general rule that a marriage which is valid by the law of the place where it is solemnized is valid everywhere.   Of course, even this general rule has its exceptions where the particular marriage is contrary to good morals, or public policy, or to the positive statutes of the country where it is sought to be enforced.   But where a man and woman, citizens of the same state, and subject to an absolute statutory prohibition against entering into a marriage contract which is against good morals and contrary to public policy, leave their domicil and enter another for the express purpose of violating the law of their domicil in this respect, the case is highly exceptional, and the great weight of authority is against the validity of such a marriage in the place of their domicil.   There have been conflicting decisions upon the question, but very few of them sustain the validity of the relation where it has been assumed for an intended evasion of the law of the domicil and is contrary to good morals.   The fact of such an intended evasion has been repeatedly recognized as the basis of invalidity when otherwise validity would have been declared.   Thus, in a noted

case in Tennessee, Pennegar & Haney v. State, 87 Tenn. 244, decided in 1889, where the same question precisely as in this case was raised, to wit: a marriage in Alabama between a man and woman domiciled in Tennessee, who had been guilty of adultery and, after a divorce had been obtained in Tennessee on that ground, the guilty husband and his paramour went to Alabama and were married, and at once returned to Tennessee. They were indicted in Tennessee for lewdness, and were convicted and sentenced, and appealed to the Supreme Court, claiming that the marriage being lawful in Alabama must be held lawful in Tennessee. In the latter state the statute prohibited such marriages in almost the words of our own act of 1815, to wit: "When a marriage is absolutely annulled the parties shall be severally at liberty to marry again; but a defendant who has been guilty of adultery shall not marry the person with whom the crime was committed, during the life of the former husband or wife." In an elaborate opinion the Supreme Court sustained the sentence and held the Alabama marriage to be void in Tennessee. In view of the close analogy of the case to the one we are considering, some citations from the opinion will be appropriate. "The marriage being prohibited by statute is void if solemnized in this state. . . . Does the rule that a marriage valid where solemnized is valid everywhere, make the second marriage in Alabama in this case valid. . . . Marriage is an institution recognized and governed to a large degree by international law prevailing in all countries, and constituting an essential element in all earthly society. The well being of society, as it concerns the relation of the sexes, the legitimacy of offspring and the disposition of property alike demand that one state or nation shall recognize the validity of marriages had in other states or nations according to the laws of the latter, unless some positive statute or pronounced public policy of the particular state demands otherwise." The opinion further holds that the rule that a marriage valid where solemnized is valid everywhere has its exceptions, to wit: "(1) Marriages which are deemed contrary to the law of nature as generally recognized in Christian countries; (2) marriages which the local law-making power has declared shall not be allowed any validity, either in express terms or by necessary implication. . . . This (second) class may be subdivided into two classes: (a) where

the statutory prohibition relates to form of ceremony and quali-
fication it is held that compliance with the law of the place of
marriage is sufficient, and its validity will be recognized, not
only in other states generally, but in the state of domicil of the
parties, even where they have left their own state to marry else-
where for the purpose of avoiding the laws of their domicil;
(*b*) cases which, prohibited by statute, may or may not embody
distinctive state policy as affecting the morals or good order of
society. . . . Each state or nation has ultimately to determine
for itself what statutory inhibitions are by it intended to be im-
perative, as indicative of the decided policy of the state con-
cerning the morals and good order of society to that degree.
which will render it proper to disregard the jus gentium of
'valid where solemnized, valid everywhere.' . . . If, as we have
seen, the statutory inhibition relates to matters of form, of cere-
mony, and in some respects to qualification of the parties, the
courts would hold such valid here; but if the statutory prohi-
bition is expressive of a decided state policy as a matter of mor-
als, the courts must adjudge the marriage void here as contra
bonos mores. . . . Now believing, as we do, that the statute in
question, which we are called upon to construe in the case at
bar, is expressive of a decided state policy not to permit the
sensibilities of the injured and innocent husband or wife who
has been driven by the adultery of his or her consort to the
necessity of obtaining a divorce, to be wounded, or the public
decency to be affronted, by being forced to witness the contin-
ued cohabitation of the adulterous pair, even under the guise of a
subsequent marriage performed in another state for the purpose
of evading our statute, and believing that the moral sense of
the community is shocked and outraged by such an exhibition,
we will not allow such parties to shield themselves behind a
general rule of the law of marriage, the wisdom and perpetuity
of which depends as much upon the judicious exceptions thereto
as upon the inherent right of the rule itself." ·

The foregoing reasoning is satisfactory to us. It invokes prac-
tically three distinct ideas, to wit: (1) that the foreign marriage
is contrary to the positive statute of the domicil; (2) that it is
contrary to the public policy of the government of the domicil,
in that it offends against the prevailing sense of good morals
among the people there dwelling; and (3) it was contracted

for the express purpose of evading the positive law of the domicil, and it is therefore to be regarded as a fraud upon the government and people of the domiciliary residence. The combination of these three objections seems to be most fatal to the validity of the marriage thus contracted. The writer is disposed to regard each one of them as fatal. Instances of invalidity from each source in other matters than foreign marriages, are not at all uncommon, but it is not necessary to pursue them in the books as it would involve unnecessary labor and space. There is abundant authority for their application in the marriage cases. Perhaps the most conspicuous case of the effect of mere statutory prohibition is the Sussex Peerage Case, 11 Clarke & Fin. 85, which prohibited any marriage of any descendant of King George II. without the previous consent of the king. A marriage having been contracted at Rome between a son of George II., and a lady who was a British subject, without the royal consent, a question arose as to the validity of this marriage, which was submitted to the judges of the House of Lords. Chief Justice TINDAL, delivering the opinion, said: "The statute in question does not enact an incapacity to contract marriage within one particular country and district or another, but to contract matrimony generally and in the abstract. It is an incapacity attaching to the person of A. B. which he carries with him wherever he goes. But as a marriage once duly contracted in any country will be a valid marriage all the world over, the incapacity to contract a marriage at Rome, is as clearly within the prohibitory words of the statute as the incapacity to contract in England." The prohibitory words of the statute were general: "That no one of the persons herein described shall be capable of contracting matrimony. . . ." "Here again" said the Chief Justice, "the words employed are general or more properly universal; and cannot be satisfied in their plain, literal, ordinary meaning, unless they are held to extend to all marriages in whatever part of the world they may have been contracted or celebrated. . . . It is certain that an act of the legislature will bind the subjects of this realm, both within the kingdom and without, if such was its intention." Lord CAMPBELL said: "I have no doubt that it is competent to the British Legislature to pass a law making invalid the marriage of particular British subjects all over the world. . . . And I am clearly of opinion that the intention is sufficiently testified by the language which has been employed."

While the words used in this British statute related only to particular persons they were specific in prohibiting any marriage between such persons, and for that reason it was held that the prohibition was general and applied to any marriage no matter where it was contracted. The same principle applies, as we have heretofore indicated, to the prohibition in the case at bar. It applies to any marriage no matter where it may be celebrated, and as the parties were, and continued to be, citizens of Pennsylvania, it applied to them.

In Brook v. Brook, 9 H. L. Cases, 212, another celebrated English case, where a man had married his deceased wife's sister contrary to a British statute, the parties having gone to Denmark for that purpose, where such marriages were lawful, Lord Chancellor CAMPBELL said: " It is quite obvious that no civilized state can allow its domiciled subjects or citizens, by making a temporary visit to a foreign country, to enter into a contract to be performed in the place of domicil, if the contract is forbidden by the law of the place of domicil as contrary to the law of religion or immorality or any of its fundamental institutions." And again: " If a marriage is absolutely forbidden in any country as being contrary to public policy, and leading to social evils, I think that the domiciled inhabitants of that country cannot be permitted, by passing the frontier and entering another state in which this marriage is not prohibited, to celebrate a marriage forbidden by their own state, and immediately returning to their own state to insist on their marriage being recognized as lawful."

Upon the foregoing authorities, there is no doubt as to what the law is in England on this subject. It seems to us that these decisions are founded upon impregnable reasoning which cannot be answered, and these decisions apply with the greatest possible force to the case in hand. For in those cases the statutes did not prohibit marriages involving immoral considerations, but here where the subsequent marriage is a sort of reward for the prior adulterous intercourse, and as the subsequent cohabitation is distinctly offensive to all good citizens, the conclusion of invalidity is immensely strengthened by considerations of the greatest force.

In North Carolina, in the case of Williams v. Oates, 5 Iredell's Law Reports, 535, involving the same principle, and almost the

same facts, a similar decision was reached as in the Tennessee case, supra. A husband and wife domiciled in North Carolina were divorced for the wife's adultery. Afterwards the wife and a man, a third person, both also so domiciled, to evade the law of North Carolina which prohibited her from marrying again, went into South Carolina and were there married according to the law of that state, and immediately returned to North Carolina where they lived together as man and wife until the husband died intestate. It was held that the second wife was not the lawful widow of the deceased and was not entitled to an interest in his estate, the law of the domicil controlling the relation.

In Marshall v. Marshall, 2 Hun, 238, decided in 1874, the facts were that the plaintiff, Marshall, in 1858, was divorced from his then wife on the ground of his adultery. The parties to the divorce were then domiciled in New York. In 1866 the husband and another woman, both then residing in New York, went to Philadelphia to be married there, intending to return immediately to New York. They were married in Philadelphia, the first wife still living, and returned to New York as intended. It was held that the second marriage was absolutely void on the ground that "if citizens leave their own country and contract a marriage abroad, such marriage being forbidden by the law of the country of their residence, but allowed by the country where it is contracted, and being celebrated with an intent to resume and followed by an actual resumption of their old residence, the validity of the contract is to be determined by the law of the domicil."

It is true that this case was afterwards overruled in the case of Van Voorhis v. Brintnall, 86 N. Y. 18, decided in 1881, but as neither of these decisions is binding upon us we much prefer the ruling in Marshall v. Marshall. It is also true that in Medway v. Needham, 16 Mass. 157 (1819), a contrary decision was made in the case of a marriage between a mulatto and a white woman which was solemnized in Rhode Island where it was not unlawful, it was held valid in Massachusetts where such marriages were prohibited, although the parties were domiciled in Massachusetts and immediately returned there. The marriage was not questioned because it was contrary to good morals, but only because it was contrary to the words of the Massachusetts

statute. The decision however expressly excepted the case of incestuous marriages or others that "would tend to outrage the principles and feelings of all civilized nations," and hence is of scarcely any weight in the present contention. It was followed with reluctance in Putnam v. Putnam, 8 Pick. 433, but it was held to be doubtful of application, in West Cambridge v. Lexington, 1 Pick. 505, if the husband had come into Massachusetts to claim any marital rights, "upon the ground that the marriage upon which he founded his claim was contracted in violation of the laws of this state, and that it was contrary to good policy as well as detrimental to the public manners, that he should be allowed to enforce such claim."

It is proper to observe that the leading text writers on the conflict of laws express the same conclusions as embodying the latest and best considered doctrine upon this subject. Thus in Story's Conflict of Laws, sec. 86, it is said: "But we are not therefore to conclude that every marriage by and between British subjects in foreign countries will be held valid, because it is celebrated according to the laws of such countries. On the contrary, where the laws of England create a personal incapacity to contract marriage, that incapacity has in some cases been held to have a universal operation, so as to make a subsequent marriage in a foreign country a mere nullity when litigated in a British court. Sec. 87. Indeed the general principle adopted in England in regard to cases of this sort appears to be, that the lex loci contractus shall be permitted to prevail, unless where it works some manifest injustice, or is contra bonos mores, or is repugnant to the settled principles and policy of its own laws." In sec. 112, quoting from Lord Robertson, in Fergusson on Marriage and Divorce, 397 to 399, it is said: "But a party who is domiciled here cannot be permitted to import into this country a law peculiar to his own case which is in opposition to those great and important public laws which our legislature has held to be essentially connected with the best interests of society." In a foot note to sec. 116, the author quotes from 1 Burge Com. on Col. and For. Law, pp. 188 to 191, as follows: "The law which prohibits persons related to each other in a certain degree from intermarrying, and declares their intermarriage to be null, imposes on them a personal incapacity quoad that act; and that incapacity must continue to affect them as long as they retain their

domicil in the country in which that law prevails.  The resort to another country where there was no such prohibitory law, for the mere purpose of evading the law of their own country, and with the intention of returning thither when their marriage had taken place, cannot be considered a change of their former domicil, or the acquisition of a domicil in the country to which they had resorted.  They must therefore be regarded as still subject to the personal incapacity imposed by the law of their real domicil."

In Whart. Confl. of Laws, sec. 159, the writer says: "But, when persons domiciled in a state where these prohibitions are in force are married without the domicil, in violation of such prohibitions, in a state where there is no opposing legislation, the parties visiting the latter state for this purpose, will the former state recognize the validity of the marriage?  The first point for the court of such a state to determine on such an issue is whether the prohibition of such marriages is part of the distinctive policy of the state.  If so, the court acting on the reasoning already given, must hold that persons domiciled in such state cannot evade its laws by going to another state and then returning to live in the home state in a union that state condemns. And so it has been ruled on several occasions:" Kinney v. Com., 30 Gratt. 858; Williams v. Oates, 5 Ired. Law Rep. 538; State v. Kennedy, 76 N. C. 251; Scott v. State, 39 Ga. 321; Dupre v. Boulard, 10 La. Ann. 411.

Upon the whole case we consider that the weight of authority is against the validity of the marriage we are now considering, and upon well settled principles we are convinced that it should not be sustained.

The decree of the court below is affirmed and the appeal is dismissed at the cost of the appellant.