In the Matter of the Accounting of SECURITY TRUST COMPANY OF ROCHESTER, as Executor of VIRGIL M. PALMER, Deceased.

Surrogate's Court, Monroe County, May 27, 1948.

*Charles McLouth* and *Stephen V. Lines* for Erna M. Palmer, movant.

*Charles J. O'Brien* for Virgil M. Palmer, Jr., and another, respondents.

*Abraham Schulman,* special guardian for Virgil M. Palmer III, and others, infants, respondents.

*C. Frederic Jefferson* for executor, petitioner.

WITMER, S. The testator's two sons, Virgil M. Palmer, Jr., and Harold B. Palmer, respondents herein, are the principal legatees under his will. In the course of the proceedings for the judicial settlement of the account of the executor the sons filed objections to that portion of the account (schedule K) herein which acknowledged Erna M. Palmer to be the testator's widow and recognized the validity of the election filed by her to take the widow's share of testator's estate as in intestacy. Respondents charge in their objections that Erna M. Palmer is not the testator's widow. They have served a notice (Civ.

Prac. Act, §§ 288, 290; Surrogate's Ct. Act, § 316) for taking the testimony of Erna M. Palmer upon the subject of her relationship with the testator on and prior to June 5, 1942, when a decree of divorce because of adultery was granted in this county to her former husband against her, and specifically to ascertain if the testator was her paramour and the cause for the divorce. Erna M. Palmer has moved (Civ. Prac. Act, § 291) to vacate the notice to take such testimony on the grounds that it is not material, is privileged, will be inadmissible upon the trial of the issue, and is not sought in good faith but only to embarrass her. She also asserts that respondents are estopped to deny her status by reason of a written agreement which they made with her with particular reference to insurance proceeds before the judicial settlement proceedings were commenced.

For the purposes of this motion it is assumed that the information sought by the respondents through the examination will be favorable to them. (*Matter of Budd,* 267 App. Div. 966; *Matter of Friedman* [*Roseth Corp.*], 271 App. Div. 870.) Respondents are clearly acting in good faith. The claims that the information sought is privileged and inadmissible are not grounds for denying the examination before trial. Objections on such grounds may be made on the appropriate occasions. (*King* v. *Liotti,* 190 Misc. 672.) The court is not impressed by the widow's charge that respondents are estopped upon this judicial settlement proceeding to deny her status, and finds in the facts and argument in support of her estoppel theory no basis for granting the motion to vacate. It remains, therefore, to determine the question of the materiality of proof that the testator was the paramour of movant as alleged. As above indicated the statements of fact made herein are assumed to be true only for the purposes of this motion, which assumption is otherwise wholly without prejudice to movant.

The adultery of which the widow's first husband complained took place, according to the records of the divorce proceeding, at testator's residence address within six or eight months after his first wife's death. On October 29, 1942, shortly after the divorce decree against movant became final, she and the testator went to Pennsylvania for the sole purpose of being married, and returned immediately to Rochester, New York, to continue their residence here. They went to Pennsylvania to escape the injunction contained in the New York law and the divorce decree forbidding movant thereafter to marry anyone except the plaintiff in that action so long as he should live. Her first

husband was alive at the time of her Pennsylvania marriage to the testator.

The law of New York forbidding remarriage of the divorced spouse during the life of the nonoffending spouse is not effective beyond the territorial limits of this State, and a marriage contracted in another State by such a divorcee which is otherwise valid will be recognized as valid in New York. (*Van Voorhis* v. *Brintnall*, 86 N. Y. 18; *Thorp* v. *Thorp*, 90 N. Y. 602, 606; *Moore* v. *Hegeman*, 92 N. Y. 521, 524; *Cunningham* v. *Cunningham*, 206 N. Y. 341, 344–345; and see Restatement, Conflict of Laws, § 130.) Accordingly, movant's marriage to the testator is valid, unless it be void under the law of Pennsylvania.

Upon the application blank for the Pennsylvania marriage license there was an informational note that the license would not be granted to corespondents in divorce. Movant and testator misrepresented the facts in their application for a marriage license, stating that she had divorced her husband, instead of the contrary which was the case. Still the license was issued, and the marriage was performed in all respects in accordance with the formal requirements of the law of Pennsylvania. Presumptively, the marriage was authorized by the Pennsylvania law. (*Matter of Green*, 155 Misc. 641, 644.) The failure to reveal that testator was movant's paramour leading to the divorce, is of no substantial significance unless the marriage be void by reason of the fact that the testator was the paramour.

The court has examined Pennsylvania statutes and law reports (Civ. Prac. Act, § 344-a) to ascertain the law applicable to the marriage in question. Section 9 of the Pennsylvania Divorce Act of March 13, 1815, was still in effect at the time of movant's marriage to testator in Pennsylvania in 1942. Purdon's Pennsylvania Statutes, a set of many volumes containing the statutory laws of Pennsylvania and organized in accordance with subject matter, with annotations thereof, is apparently the work used in Pennsylvania as we use McKinney's Consolidated Laws of New York and as the United States Code Annotated is used for the Federal laws. Under section 92 of title 23, Divorce, and under section 169 of title 48, Marriage, Purdon's Pennsylvania Statutes sets forth section 9 of the Pennsylvania Divorce Act of March 13, 1815, as the current law on the subject. The section provides as follows: " The husband or wife, who shall have been guilty of the crime of adultery, shall not marry the person with whom the said crime was committed during the life of the former wife or husband; but nothing herein contained

shall be construed to extend to or affect or render illegitimate any children born of the body of the wife during coverture."

Under this section, clearly if movant and her first husband had been domiciled in Pennsylvania and the divorce had been granted there, the subsequent marriage therein would have been void, and Pennsylvania has even held the same to be true under such facts except that the divorcee and her paramour went to Maryland to be married, which State had no prohibition against such marriage. (*Stull's Estate,* 183 Pa. 625 [1898].) The basis for the latter decision is that Pennsylvania deems it imperative for the protection of the marriage institution within its limits that the offending spouse be not permitted to return with his or her paramour and live in the community with him or her in legitimate union to the chagrin of the nonoffending spouse. Section 132 of the Restatement of Conflict of Laws recognizes this as a proper exception to the general rule that the law of the place of the contract determines the legality thereof.

Does the Pennsylvania statute and the policy enunciated by its highest court in *Stull's Estate (supra),* render void the marriage in the present instance? Apparently no court in Pennsylvania has had occasion to pass upon this point. That is only natural since the parties to such a marriage are only in Pennsylvania long enough to be married, and leave immediately to return to their domicile where the legal problems arise. Only if such parties or one of them should subsequently become domiciled in Pennsylvania could the question be raised there. This fact is significant not only as explaining the absence of decisions on the point in Pennsylvania, but also because it emphasizes that a question of conflict of laws is involved and that the domestic policy of the State of Pennsylvania is not an important factor.

It is suggested that the Pennsylvania statute forbidding marriage to the paramour is merely a tail to a divorce granted under the Pennsylvania law, in effect an injunction against the divorcee, and that it is wholly inapplicable to persons divorced in another State but marrying in Pennsylvania. Although no Pennsylvania pronouncement on this subject has come to the court's attention, Surrogate ROLLINS of New York County in 1887, prior to the decision in *Stull's Estate (supra)* adopted this view and held that the statute in question is limited to persons divorced under Pennsylvania law. (*Stack* v. *Stack,* 6 Dem. 280.) The decision in the *Stack* case (*supra*) has stood a long time and has not been disapproved either in this

State or in Pennsylvania. It is accepted as a proper precedent herein.

If the Uniform Marriage Evasion Act were in effect in Pennsylvania at the time of this marriage, the marriage would be void. (*Canwright* v. *Canwright*, 273 App. Div. 184; *Beaudoin* v. *Beaudoin*, 270 App. Div. 631.) But Pennsylvania has not enacted such act, nor any similar act, and neither has the State of New York. (1 Vernier, American Family Laws [1931 ed.], § 45, and 1938 Supp.) Moreover, the Uniform Marriage Evasion Act, approved and recommended in 1912, by the National Conference of Commissioners on Uniform State Laws has only been adopted by five States (9 Uniform Laws Annotated, p. 479) and although several other States have some sort of marriage evasion act (see Vernier, American Family Laws), by resolution of such National Conference adopted in August, 1943, the Uniform Marriage Evasion Act was withdrawn from the active list of uniform acts recommended for adoption by the States, because with the lack of widespread adoption " it merely tends to confuse the law ". (Handbook of National Conference of Commissioners on Uniform State Laws and Proceedings, 1943, p. 64.) Thus not only have Pennsylvania and New York failed to enact marriage evasion laws, but there is reason to believe that the policy of the two States will not be guided by such laws.

It is fundamental that the law of the place of the contract determines its validity both as to domiciles and nondomiciles. (*Lemmon* v. *People*, 20 N. Y. 562, 602; *United States Mortgage & Trust Co.* v. *Ruggles*, 258 N. Y. 32, 38; 1 Beale, Conflict of Laws, pp. 278–279, 308 *et seq.*; 15 C. J. S., Conflict of Laws, § 11, p. 883; § 14, p. 907; § 15.) This rule holds true generally with respect to contracts of marriage, but if the parties are not domiciled in the State where the marriage is celebrated, to some extent the law of the domicile will control. (1 Beale, Conflict of Laws, p. 468; Vol. 2, pp. 692–694; *People* v. *Baker*, 76 N. Y. 78, 86; *Stull's Estate*, 183 Pa. 625, *supra*.) It is said, however, that if the marriage be invalid by the law of the State wherein it was celebrated, " there is no marriage, whatever be the law of the domicil or of any other state." (2 Beale, Conflict of Laws, p. 674.) This statement by Professor Beale seems to be the general law, but later students of the subject have examined the question carefully and have stated cogent reasons why the rule does not or at least should not mean what it appears to express. (Cook, The Logical and Legal Bases of the Conflict of Laws [1942 ed.], ch. XVII; Rabel, The Conflict of Laws,

[1945 ed.].) We are here confining our discussion to the case of a marriage (of persons domiciled out of the State) which has been celebrated wholly in accordance with the formal requirements of the local laws, but which if between persons domiciled within the State would offend the public policy of the State so as to be held void, as in *Stull's Estate* (*supra*). Both Mr. Cook and Mr. Rabel point out that since the parties to the marriage are not domiciled in the State of its celebration, and depart at once to live in the State of their domicile or intended domicile, a conflict of laws problem is presented to the State of celebration, and it should apply as its law in this situation, not its law for its domiciles, but its conflicts law, to wit, the law of the domicile of the parties. This makes good sense, although in some cases, as where the parties have no definite intended domicile, practical difficulties may arise.

In the instant case Pennsylvania has a strong public policy against permitting such a marriage between its own domiciles, and so it forbids the union. Such marriage, though consummated in accordance with the required formalities, is declared void by Pennsylvania law, wherever performed. (*Stull's Estate, supra.*) Professor Beale says that in such case the statute in Pennsylvania " is examined as a declaration of domestic policy and not for the purpose of determining, as in our usual case, whether the marital status has been created." (2 Beale, Conflict of Laws, p. 695.) As before noted, this principal is recognized by the Restatement of Conflict of Laws (§ 132). In principle this is recognizing the law of the domicile as opposed to the law of the place of the contract. The instant case calls for the application of the same principle, but upon the reverse factual basis.

As to persons domiciled in another State in which the parties will live and which has no public policy against the marriage, Pennsylvania's examination of the marriage in connection with the statute should not be in the light of its domestic policy. Cook, at pages 450–451, says that the State of the " domicil of either party at the time of the ceremony is recognized as having power to validate or invalidate, as the case may be, such a marriage, irrespective of what the law of the state of celebration may be "; and that in the absence of express statutory provision, the State of celebration should declare its law to be that " of the ' intended family domicil ' as the decisive one in determining capacity to marry." Thus, he distinguishes

between the " domestic rule " and " the conflicts rule " of the law of the State of celebration of the marriage (pp. 453–454). Rabel refers to the law of the domicile as the " personal law " and urges that it, rather than the law of the place of celebration, should determine the validity of the marriage (pp. 192–196, 293) and he further says (p. 246) that " apart from certain elementary exceptions, such as the rejection of polygamous and incestuous bonds, there has appeared a ' substantial ' and ' growing ' body of cases to protect the law of the domicil of the parties." (To same effect see 10 So. Calif. L. Rev. 200–202.)

" Every presumption lies in favor of the validity of a marriage." (*Fisher* v. *Fisher,* 250 N. Y. 313, 317; and see *Cunningham* v. *Cunningham,* 206 N. Y. 341, *supra.*) In the light of this attitude of our courts and the conflict of laws principle above discussed, and in the absence of any declaration by the courts of Pennsylvania to the contrary, it is held that the " conflicts rule " or the public policy law of the domicile of the parties, namely, the law of New York, applies to this marriage.

As has been previously noted herein the marriage in question was not prohibited by the law of the State of New York. New York has no public policy against the marriage by a divorcee to his or her paramour. The New York statute provides that the divorcee, after three years of good conduct following the divorce, may apply for permission to remarry, and no limitation is placed upon such permission. The marriage in no way offends the law or the policy of the State of New York.

It is held, therefore, that the information sought by respondents under their notice to examine the movant before trial is immaterial; and the motion to vacate such notice is granted.

Submit order accordingly.