## H and W Application for Marriage License

KLEIN, P. J., and LEFEVER, J., January 9, 1956.— H and W filed an application for a marriage license on the usual form. The clerk refused to grant this license on the ground that the applicants were already married to each other and, therefore, he was without power to issue a new license. The applicants appealed to this court and a full hearing was held forthwith, at which applicants and their respective fathers testified.*

It appears that on February 14, 1955, H, aged 19, and W, aged 15, both residents of Philadelphia, without the knowledge or consent of their respective parents, applied for a marriage license in the Cecil County Court, Elkton, Md. H gave his correct age. W stated that she was 16 years old. The clerk informed the applicants that to obtain the license they

---

* This is the fourth case arising under the new "The Marriage Law", Act of August 22, 1953, P. L. 1344, in which President Judge Klein and Judge Lefever have sat together, and filed a joint opinion and decree. In re Enderle Marriage License, 1 D. & C. 2d 114; F. A. Marriage License, 4 D. & C. 2d 1; Application of Pest and Kolesnik Marriage License, 4 D. & C. 2d 12.

would be required to present the consent of their respective parents or guardians, signed under oath.

Thereupon, at the request of the applicants, X, an imposter, impersonated the mother of W, forged the consent of W's mother to the marriage, and acknowledged it before notary public A; and X, impersonating an alleged sister of H, signed the consent of said sister to the marriage, and acknowledged it before notary public B.

Applicants then filed these consents with the clerk of Cecil County, and a marriage license was issued. Thereupon, applicants were married by a clergyman in Elkton, Md.

Applicants returned to Philadelphia and disclosed their marriage to their parents. For about a week thereafter H and W lived separately at the homes of their respective parents, until H was able to obtain an apartment for them. H and W then moved into this apartment. Since then, they have resided and cohabited together in Philadelphia, as man and wife.

W is now pregnant; her first child is expected in two months. W is now 16 years old, and H will be 20 years old next week. Both of the applicants and their respective parents are eager to obtain a marriage license for the applicants and to have another marriage ceremony performed so as to make certain that the applicants are validly married and that there can be no possible question as to the legitimacy of their progeny.

Applicants have complied with all formal requirements for the issuance of a marriage license in Pennsylvania, including blood tests and the written consent of their parents. The pastor of their church has signified his willingness to perform the marriage ceremony, if the license is issued.

The question presented is whether the court can,

and should, issue a marriage license to the applicants under these circumstances.

The well established doctrine of conflicts of law is that the law of the place where the marriage took place governs its validity: Commonwealth v. Custer, 145 Pa. Superior Ct. 535 (1941). See Stull's Estate, 183 Pa. 625, 630 (1898). Therefore, we turn to the laws of Maryland to determine the validity of the marriage of the applicants.

The Annotated Code of Maryland, 1951, article 62, sec. 9(a), provides:

"It shall be unlawful within the State for any female below the age of sixteen years . . . to marry . . . or for any female between the ages of sixteen and eighteen years, or for any male under the age of twenty-one years to marry, unless the parent or guardian of such male or female, in person or by signed affidavit, assent thereto. . . ."

The statute does not specify whether a marriage, consummated in violation of this provision, is void, voidable or valid with attaching penalties. No Maryland case on this point has been called to our attention. However, the United District Court for the District of Columbia held such a Maryland marriage to be valid, but observed: "Certainly, the language of the statute, 'it shall be unlawful', is capable of being interpreted as a legislative intent not only to make the forbidden marriages criminal but also null and void": Hitchens v. Hitchens, 47 F. Supp. 73, 76 (1942).

In Brown v. Scott, 140 Md. 258 (1922), and in Robertson v. Cole, 12 Tex. 356 (1854), marriages were annulled under somewhat similar circumstances: "It is a well established principle, that a marriage, procured by force or fraud, is null and void. .. . The license under which the officer of the law was officiating, was not issued in good faith or on truthful statements, but on misrepresentations and false oaths":

Robertson v. Cole, supra, page 364. Similarly, perjury was one of the elements which swayed a Maryland Court to annul a marriage: Corder v. Corder, 141 Md. 114 (1922).

In Pennsylvania, misrepresentation of age in obtaining a license does not necessarily invalidate a marriage. But if we add to the misrepresentation the criminal conduct of the parties in this case, the marriage must, at least, be viewed with opprobrium. The forum need not recognize a marriage which is contrary to good morals or positive public policy: Shull's Estate, supra. See Commonwealth v. Custer, supra. This casts further doubt upon the validity of this marriage.

The public policy of this Commonwealth favors the marriage relationship. Marriage protects the security of the home and the welfare of children. "Marriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the legislature. That body prescribes the age at which parties may contract to marry, the procedure or form essential to constitute marriage, the duties and obligations it creates, its effects upon the property rights of both, present and prospective, and the acts which may constitute grounds for its dissolution": Maynard v. Hill, 125 U. S. 190, 205 (1888).

"The law for certain purposes regards marriage as initiated by a civil contract, yet it is but a ceremonial ushering in of a fundamental institution of the state. The relation itself is founded in nature, and like other natural rights of persons, becomes a subject of regulation for the good of society. The social fabric is reared upon it, for without properly regulated marriage, the welfare, order and happiness of the state cannot be maintained": Cronise v. Cronise, 54 Pa. 255, 262 (1867).

History and sociology attest the fact that marriage and the family unit constitute the fundamental relationship upon which all societies, whether savage or cultured, are founded. Marriage is accepted today in all civilized nations and exists in some form in the most primitive tribes.

Where there are reasonable doubts as to the validity of a prior marriage, it is in the vital interest of the Commonwealth to enable the applicants to remove the threat to their union and validate their jointure with a subsequent ceremonial marriage. Moreover, this court is deeply concerned with the protection of the legitimacy of children. Applicants are minor residents of this county, and as such, in effect, wards of this court. We are not unmindful of the improper, even criminal conduct of the applicants and X in fraudulently procuring the marriage license through misrepresentation and false oaths. We do not condone this conduct; we castigate it. However, our strong disapproval of such conduct should bow to the more important desideratum of enabling applicants to validate their marriage and to make certain that their progeny will be legitimate offspring with all the rights, duties and responsibilities flowing therefrom.

Both applicants and their respective parents are eager to eliminate any possible doubt as to the validity of the marriage and the legitimacy of the applicants' progeny. If there were no doubt as to the validity of the marriage then to issue another license would be a useless formality, would clutter the records, would make for needless confusion, and would be an absurdity. But where, as in this case, the doubt is reasonable and the parties wish "to remove the cloud", the license should be issued. See Whitman Application for Marriage License, 60 York 108 (1946).

It may be argued that the applicants could eliminate any doubt as to the validity of the Maryland ceremonial

marriage by contracting a common law marriage in Pennsylvania, which requires no license. However, the public policy of this State is emphatically to prefer a ceremonial marriage to a common law marriage. As well stated by President Judge Keller: "The law of Pennsylvania *recognizes* common law marriages. But they are a fruitful source of perjury and fraud and, in consequence, they are to be *tolerated, not encouraged;* . . .": Baker v. Mitchell et al., 143 Pa. Superior Ct. 50, 54 (1940) (quoted with approval in Stauffer Estate, 372 Pa. 537, 541, and Blecher Estate, 381 Pa. 138, 142 (1955) ). See Kolber Estate, 5 D. & C. 2d 426 (1956). Common law marriage is no satisfactory substitute for ceremonial marriage in this, or any other, situation.

For all of the foregoing reasons we conclude that the marriage license should issue. Accordingly, we enter the following:

### Decree

And now, to wit, January 9, 1956, the clerk is directed forthwith to issue a marriage license to the applicants.