Opinion by
Porter, J.,
The parties to this proceeding in divorce are “of kin *567 of the degree of first cousins;” both are natives of Pennsylvania and were domiciled in this state on April 15, 1906, when, each knowing that because of their relationship they could not lawfully be joined in marriage in this state, they went to Wilmington in the state of Delaware and were there married. They returned to the state of Pennsylvania shortly after the marriage ceremony and here lived as man and wife, two children, now living, having been the fruit of the marriage. The libelant left the house of respondent on December 7, 1908, and has since that time been living at the house of her father. She filed this libel in the court below on December 29, 1909, alleging that the parties were of “kin of the degree of first cousins,” that the marriage was null and void and in violation of the Act of June 24, 1901, P. L. 597, and that “not being desirous of continuing a relationship which the law forbids as being incestuous,” she prayed that a decree be made divorcing her from the bonds of matrimony between her and the said respondent. The libel did not allege nor did the evidence disclose any misconduct on the part of the respondent, nor that the libelant was entitled to a divorce upon any ground other than that above indicated. The court below refused to grant the divorce and entered a decree dismissing the libel. The libelant appeals from that decree.
The only question in this case is whether the marriage, which was lawful in the state of Delaware in which it was celebrated, is rendered void, for the reason that the parties, being domiciled in Pennsylvania, and knowing that the statute of this state prohibited their being joined in marriage, they left this state for the purpose of being married in the state of Delaware, the law of which permitted such marriage, and shortly after the ceremony returned to their Pennsylvania domicile and there continued to reside. The case is an important one to the public, as well as to these parties and the two children whom they have brought into the world. Had either of these parties died this marriage could not have been *568 subsequently challenged. While both of the parties are living the validity of the marriage can be inquired into anywhere and in any proceeding. If this marriage is to be dissolved it must be upon the ground that it was void ab initio, “to ajl intents and purposes,” and the two children, the fruit of the pretended marriage, must be branded as illegitimate: Walter’s App., 70 Pa. 392. Before deciding that such consequences must follow a marriage contracted under these circumstances, we must, in view of the fact that many such marriages have no doubt been contracted by citizens of Pennsylvania during the past ten years under precisely similar circumstances, be satisfied that established principles clearly point to that conclusion.
Marriage is treated by all civilized nations as a peculiar and favored contract. The general principle certainly is, that between persons sui juris, marriage is to be decided by the law of the place where it is celebrated. If valid there it is valid everywhere: Story on Conflict of Laws, sec. 113; Patterson v. Gaines, 47 U. S. 550; Phillips v. Gregg, 10 Watts, 158; Van Storch v. Griffin, 71 Pa. 240.
“This rule was shown, by the foreign authorities referred to by Sir Edward Simpson, in 1752, in the case of Schrimshire v. Schrimshire to be the law and practice in all civilized countries, by common consent and general adoption. It is a part of the jus gentium of Christian Europe, and infinite mischief and confusion would ensue with respect to legitimacy, succession, and other rights, if the validity of the marriage contract was not to be tested by the laws of the country where it was made:” 2 Kent’s Commentaries, 92. The learned author' cites many authorities in support of his text, among them the English cases sustaining the validity of the marriage in Scotland of minors who ran away, without the consent of his or her guardian, from an English domicile, to avoid the English law, which prohibited the marriage, and returned to the English domicile after the marriage. The *569 rule is, however, subject to exceptions, and cannot be applied to sustain a polygamous marriage, or one that is by all civilized nations regarded as incestuous and immoral: Medway v. Needham, 16 Mass. 157. “In respect to the first exception, that of marriages involving polygamy and incest, Christianity is understood to prohibit polygamy and incest, and therefore no Christian country would recognize polygamous, or incestuous marriages. But when we speak of incestuous marriages, care must be taken to confine the doctrine to such cases as by the general consent of all Christendom are deemed incestuous:” Story on Conflict of Laws, sec. 114. The reason for this exception would seem to be, that as the rule derives its force only from comity among civilized nations, it cannot avail to sustain a marriage which is forbidden by the Divine law. The marriage of persons of kin of the degree of first cousins has been and is lawful,’ and not incestuous, in^ a large majority of the states of the United States. Such is the law of England, Scotland, Ireland, the colonies of Great Britain, and of the Protestant countries of continental Europe; Story on Conflict of Laws, sec. 114 (b); Blackstone’s Commentaries, book 1, p. 435 and notes (Sharswood’s Edition). The marriage with which we are now dealing was not, therefore, unlawful because incestuous, within the meaning of the general exception to the rule recognized by the law of nations. The marriage being valid in the state of Delaware, the place of the contract, would be held valid everywhere outside the state of Pennsylvania. If invalid in this jurisdiction it is only so because of the Act of June 24,1901, P. L. 597, for apart from the provisions of that statute it was clearly valid.
Within the limits imposed by the constitution of the United States: “A state may prohibit the operation of all foreign laws, and the rights growing out of them, within its own territories. It may prohibit some foreign laws, and it may admit the operation of others. It may recognize and modify and qualify some foreign laws; it may enlarge or give universal effect to others. It may inter- *570 diet the administration of some foreign laws; it may favor the introduction of others. When its own code speaks positively on the subject, it must be obeyed by all persons who are within the reach of its sovereignty. When its customary, unwritten, or common law speaks directly on the subject, it is clearly to be obeyed; for it has an equal obligation with its positive code. When both are silent, then, and then only, can the question properly arise, what law is to govern in the absence of any clear declaration of the sovereign will:” Story on Conflict of Laws, sec. 23. The same learned author, in the preceding section, said: “When, therefore, we speak of the right of a state to bind its own native subjects everywhere, we speak only of its claim and exercise of sovereignty over them when they return within its own territorial jurisdiction, and not of its right to compel or require obedience to such laws on the part of other nations within their own territorial sovereignty.” These principles give rise to a second exception to the general rule, that a marriage valid where the contract is entered into will be accepted as valid everywhere, which exception may be thus stated. When a nation, or state, by statute prohibits one of its subjects or a class of such subjects to contract matrimony, generally and in the abstract, employing in the statute language sufficiently indicating the intention to impose a personal incapacity to contract marriage either within or without the realm, or by statute prohibits marriages between persons related in a certain degree expressly upon the ground that such marriages are “contrary to God’s law,” and a subject of such nation marries in violation of such prohibition, while in a foreign country where the marriage is lawful, such marriage will upon the return of the person to his own domicile be held invalid by the ■courts of that domicile. Perhaps the most conspicuous case which has arisen under the first branch of this exception is the Sussex Peerage Case, 11 Clark & Fin. 85. That case arose under the statute of 12 Geo. III c. 11, which ■prohibited any marriage of any descendant of King *571 George II, without the previous consent of the king. Á marriage having been contracted at Rome between a son of George III and a lady who was a British subject, without the consent of the king, a question arose as to the validity of this marriage, which was submitted to the judges of the House of Lords. It was held that the marriage was clearly within the words and purpose of the statute, the chief justice saying: “Here again, the words employed are general or more properly universal; and cannot be satisfied in their plain, literal, ordinary meaning, unless they are held to extend to all marriages in whatever part of the world they may have been contracted or celebrated. ... It is certain that an act of the legislature will bind the subjects of this realm, both within the kingdom and without, if such was its intention.” All the members of the court expressed the opinion that the language of the statute clearly indicated the intention to prohibit the marriage of such persons as came within its operation, whether in England or elsewhere, without the consent of the king, and the marriage was held to be void in England. In the decision of this case the purpose of the statute was given great weight, it related to the royal family, and the chief justice said, “It was founded upon the policy and the expediency which requires that no marriage of any branch of the royal family should be contracted, which might be detrimental to the interests of the state, either at home or abroad.” The statute was one which had direct relation to the organization of the government, and its construction might possibly involve the right of succession to the crown. Lord Brougham said: “ It, therefore, follows that a prince going abroad and contracting matrimony is, for all British purposes, with a view to the crown and rights of peerage, incapable of contracting matrimony; and any marriage so contracted is null and void.” The decision in that case was founded upon the comprehensive language of the statute and the peculiar purpose for which it was enacted. It is an authority supporting the power of a kingdom to *572 prohibit the marriage of a subject while in a foreign country, although the marriage be lawful under the laws of that country, and to enforce that prohibition and nullify the marriage upon the return of the subject to his native domicile. But upon the construction and effect of the Pennsylvania statute with which we are now dealing it gives no light.
The leading case in Pennsylvania in which this second exception to the general rule has been recognized and applied, and a statute of the state given an exterritorial effect, is Stull’s Est., 183 Pa. 625. The court in that case construed the Act of March 13, 1815, P. L. 286, which forbids the husband or wife who has been guilty of the crime of adultery to marry the person with whom the said crime was committed, during the life of the former husband or wife. The court held that the language of the statute clearly indicated that the legislative intention was to forbid the marriage relation to be contracted; that it was aimed at the existence of the marriage state between the parties. Mr. Justice Green, who spoke for the court, said: “A. personal incapacity to marry is imposed. The necessary meaning of this language is that they shall not marry at all, in any circumstances, or at any time, or any place, so long as the injured party is living. So far as the purpose and meaning of this statute are concerned it is of no consequence where such subsequent prohibited marriage takes place. The relation itself is absolutely prohibited, and hence is within the operative words of the statute, without any reference as to where the marriage occurs.” The court further held that the prohibition of the statute, there involved, embodied a distinctive state policy as affecting the morals and good order of society. The parties in that case were subject to the prohibition and were domiciled in Pennsylvania, they went into another state where they might lawfully be married and were there married and immediately returned to their Pennsylvania domicile. The marriage was judged *573 mine for itself what shall be regarded as immorality./ That is contra bonos mores which in any particular country, or among .the people of that country, is of such evil example as to shock the general public sentiment. These considerations and the construction which the court gave to the statute there involved, brought the marriage involved in Stull’s Estate clearly within both branches of the exception to the rule which we are now considering. The statute prohibited the existence of the marriage relation and forbade the marriage whether the ceremony was performed inside the state or beyond its territorial limits, and the cohabitation of the parties as man and wife was declared to be against good morals, and offensive to decency. The same result had been reached in construing similar statutes in other states, and the authorities were cited and commented upon in the opinion to which we have referred. In Williams v. Oates, 5 Iredell, 535, which dealt with a statute similar to that considered in Stull’s Est., 183 Pa. 625, the opinion suggests that where one party has been divorced and forbidden to marry during the life of former husband or wife, the incapacity arising out of the first marriage continues notwithstanding the divorce; that the party having married once cannot marry again; that in order to marry anywhere he must aver that he had been divorced in the state of North Carolina, and that the reply to this was that his right to marry anywhere depended upon the law of North Carolina.
The cases which have arisen under the second branch of this exception, where the statute of a state prohibits the marriage of persons related in a certain degree upon the ground, in the statute expressed, that such marriages are contrary to the law of God, or that they are immoral, are not numerous, but in England they led to a very definite conclusion. The most important of those cases is Brook v. Brook, 9 House of Lords, 193. A widower and the sister of his deceased wife, both British subjects and having their domicile in England, were married while in Denmark, where their marriage was lawful, and returned *574 to England where they continued to reside. Such a marriage was by an English statute forbidden upon the ground, in the statute expressed, that it was “contrary to God’s law.” The marriage was held to be unlawful in England, but in this case the decision was again based upon the language employed in the statute. The lord chancellor, after quoting the language of the statute, said: “Sitting here, judicially, we are not at liberty to consider whether such a marriage is or is not contrary to God’s law, nor whether it is expedient or inexpedient.” It was held that the statute conclusively settled the question that the marriage relation between the parties was in violation of the Divine law, it was within the general exception to the rule recognizing the validity of foreign marriages, and that in England it must therefore be held invalid. This was but an assertion of the well-recognized right of each nation to determine for itself and to authoritatively declare what is or is not immoral. The logical result of this was reached in Mette v. Mette, 1 Swabey & Tristram, 416. In that case a native of Germany who had become a naturalized subject of Great Britain, where his first wife died, afterwards went to Frankfort-on-the-Main and there married a sister of his deceased wife, who was a native of Frankfort and had been and was there domiciled. It did not appear in the case that the second wife had prior to her marriage ever been in England. By the law of Frankfort and also by the law of Hesse Cassel that marriage was valid. Soon after the marriage he returned with his wife to England and there resided until his death, and several children were born of the marriage. It was held that the marriage was void and the children illegitimate. So long as the law of England remained unchanged, a British subject could not in any country contract a marriage with the sister of his deceased wife which would by the law of England be recognized as valid. It may be that the conclusion reached in these English cases was influenced by the British tenet of perpetual allegiance, with regard to which Chief Justice Gibson said, in Dorsey *575 v. Dorsey, 7 Watts, 349: “Though an English subject acquire a foreign character from a foreign domicile, in so much as to be dealt with as an alien for commercial purposes, though he formally renounce his primitive allegiance and profess another; he is accounted but a sojourner while abroad, and England, by the dogma of her government is his home and his country still. Holding this dogma it would be strange did she tolerate foreign interference with his domestic relations within her pale. Insisting on jurisdiction of his person, absent or present, she necessarily regards an attempt to change any one of these as an invasion of her sovereignty, and in that respect it cannot be denied that the matter is within her province and her power; for though the status of marriage be juris gentium, the institution is undoubtedly a subject of municipal regulation.”
Where a state forbids marriage between certain persons, or classes of persons, merely upon the ground of expediency and not upon moral grounds, or such as would tend to outrage the principles and feelings of all civilized nations, the general rule as to the validity of foreign marriages prevails: Medway v. Needham, 16 Mass. 157; Putnam v. Putnam, 25 Mass. 433; Stevenson v. Gray, 56 Ky. 193, and the Scotch marriage cases of English minors, which have been in England held valid. These general principles are recognized through all the cases.
The marriage relation between first cousins was entirely lawful under our common law and in the countries from which that law was derived, and no statute had in any manner changed.that law prior to the Act of June 24, 1901, P. L. 597. We must, therefore, consider the provisions of that statute, in the light of the principles herein-before stated, in determining whether or not the marriage of the parties to this proceeding, lawfully contracted in the state of Delaware, must be held void in Pennsylvania. The first section of the statute enacts: “That from and after the first day of January Anno Domini one thousand nine hundred and two, it shall be unlawful for any male *576 person and female person, who are of kin of the degree of first cousins, to be joined in marriage.” The second section provides that: “All marriages contracted in violation of the provisions of the first section of this act are hereby declared void.” This statute does not in express terms attempt to fix upon persons domiciled in Pennsylvania a personal incapacity to marry his or her first cousin in any part of the world, its purpose has no relation to the right, or possible right, to succeed to any public office, nor can it possibly have any connection with the organization of the government. The principles upon which the Sussex Peerage Case, 11 Clark & Fin. 85, was decided can give no support to this appeal, for it was in that case declared that no statute could be given an exterritorial effect unless the language employed sufficiently indicated the legislative intention to do so. This statute does not" expressly declare that the marriage of first cousins is. immoral, or contrary to the Divine law. If it did so, expressly or by necessary implication, we might be constrained to hold, for the reasons so ably stated in Brook v. Brook, 9 House of Lords, 193, and Mette v. Mette, 1 Swabey & Tristram, 416, that a person domiciled in Pennsylvania who went into another state or country, there married a first cousin, a native of and domiciled in that foreign state or country, and returned to Pennsylvania to reside with his wife, was not married, but simply living in concubinage. Does this statute render unlawful the very existence of the marriage relation between first cousins, and their cohabitation, in Pennsylvania, as man and wife? That it does not make the marriage relation between such parties unlawful seems clear. Prior to that statute the marriage of such parties was lawful. Under the provisions of that statute it continued to be lawful for first cousins to enter into marriage contracts in Pennsylvania, for the prohibition of the statute, by its very terms, did not go into effect until six months after the statute became a law. When this statute became a law there were undoubtedly domiciled in Pennsylvania many *577 husbands and’wives who were of kin of the degree of first cousins and whose cohabitation in the marriage relation was undoubtedly lawful. The terms of the statute, from necessary implication, disclosed the legislative intention to be, that persons of kin of the degree of first cousins, domiciled in Pennsylvania, might lawfully be “joined in marriage,” that is, might enter into the marriage contract, after the statute became a law and at any time down to the first day of January following. Now, leaving entirely out of consideration those cases in which the marriage had occurred prior to the enactment of the statute, let us consider the effect of a construction which would hold the act to prohibit the existence of the. marriage state, the continuance of the marriage relation, between first cousins, upon those cases in which the marriages were celebrated after the act became a law and before the first day of January, 1902. If it was the legislative intention to declare that the existence of the marriage state between first cousins, their cohabitation in the relation of husband and wife, should after, the first day of January, 1902, be unlawful, then all first cousins who during the six months’ interval contracted marriages did so with full knowledge, presumed as matter óf law, that their continuance in the marriage relation after the first day of January following would be unlawful. . Such persons would be in no position to assert that as to them the statute was invalid upon the ground that it impaired the obligation of the contract, or was ex post facto, for the contract was entered into after the statute became a law and in the light of its provisions. This construction would make the law of Pennsylvania to declare that from June 24,1901, to January 1, 1902,-first cousins, domiciled in Pennsylvania, might-lawfully be joined in marriage,, but that after the latter date -the-existence of the marriage relation between them should be unlawful. • The language of the statute, giving to the words employed their usual and ordinary meaning, does not. require or warrant a construction which would lead to a result-so unreasonable and-un *578 just. Taking the statute as awhole and construing it in the light of the circumstances of its enactment, the words “joined in marriage,” in the first section must be taken to refer to the original making of the contract, the ceremony of marriage, or making of the covenants in which the relation has its origin. This construction gives effect to the only intention which can reasonably be attributed to the legislature, that is, that the marriage relation between first cousins should continue to be lawful, as it always had been, when that relation had its origin in a marriage contract which was lawful at the time and place of the marriage. The statute did not make the marriage relation, the status of marriage, between first cousins unlawful, it prohibited only the celebration of the marriage, the making of the marriage contract, in Pennsylvania, from and after January 1, 1902.
The same reasons, founded upon the language of the statute, lead us to the conclusion that this act cannot be taken as a declaration that the marriage status between first cousins is either contrary to the Divine law or immoral. The statute does not expressly declare that the legislative action is taken for either of said reasons, and all the implications arising from its terms must lead us to a contrary conclusion. We are not warranted in assuming that it was the intention of the lawmaking power to assert, by this statute, that a marriage between first cousins, which would be entirely commendable and proper on December 31, 1901, would be on January 2, 1902, a thing so immoral as to offend against the prevailing sense of decency among the people of the state. Had the statute provided that marriages between first cousins should be lawful from the first day of January to the first day of July in each year and unlawful and void from the first day of July until January following, without expressing any purpose for the enactment, it certainly could not have been successfully asserted that marriages during the prohibited period must be held, judicially, to be contrary to the Divine law and immoral. Yet such a statute could *579 not, for purposes of’ this inquiry, be distinguished on principle from the one here involved. This statute, by its terms, prohibited the making of marriage contracts, the marriage ceremony, between first cousins in Pennsylvania, after January 1, 1902, and, by its second section declares marriages “contracted” in violation of its provisions void. But it does not render the existence of the marriage relation, the status of marriage, between first cousins generally unlawful, if the relation has its origin in a contract lawful when and where it was made-. It being established that this marriage was lawful in Delaware, we find nothing in the statute which would warrant us in holding it to be invalid in Pennsylvania.
The decree is affirmed and the appeal dismissed, at cost of the appellant.
October 29, 1912, appeal refused by Supreme Court.