## Weiss v. Weiss.

*Divorce—Amending libel for desertion by adding an averment that the marriage was incestuous—Marriage between uncle and niece performed in Rhode Island, where such marriage is permitted.*

1. Allegations of desertion and incestuous marriage in one and the same libel are not incompatible, and, hence, a libel for desertion may be amended by adding an averment that the parties to the marriage being uncle and niece, the marriage was incestuous.

2. Where citizens of Pennsylvania, a State in which a marriage between uncle and niece is forbidden by statute, go to Rhode Island, a state in which such marriage is permitted, and there get married and return to live in Pennsylvania, their marriage will be held invalid in the latter State.

3. A party to the marriage who, at the time of the marriage, knows of its illegality, may take advantage of the illegality in a subsequent action for divorce.

4. Acts of March 13, 1815, 6 Sm. Laws, 286, and March 31, 1860, P. L. 382, considered.

Petition to amend libel in divorce. C. P. No. 5, Phila. Co., June T., 1924. No. 942.

*S. J. Randall,* for petition; *E. Hunn, Jr.,* and *J. J. Murphy,* contra.

SMITH, J., Aug. 13, 1925.—This case grows out of a petition to amend a libel in divorce, alleging as a new cause of action incest. The libellant and respondent, before marriage, were residents of the City of Philadelphia, Commonwealth of Pennsylvania. The respondent is the daughter of the blood half-brother of the libellant. Learning that they could not legally be married in the Commonwealth of Pennsylvania, the libellant and respondent went to Rhode Island, a state in which a marriage between an uncle and niece could be lawfully entered into, and were there married. They then returned to their home in the City of Philadelphia and lived together as husband and wife. Some time later the libellant started suit in divorce against the respondent, alleging as a cause of action desertion. While the matter was still before the master, this petition was filed to amend the libel to permit evidence to be taken upon the cause of action known as incest.

"Incest is defined as sexual intercourse, either under form of marriage or without it, between persons too nearly related in consanguinity or affinity to be entitled to intermarry. Marriage between persons nearly related is prohibited in every Christian country, and incest has been forbidden to some extent by general custom from the earliest times and by people very little advanced in civilization:" 14 Ruling Case Law, 29.

In this Commonwealth, under the Act of March 13, 1815, 6 Sm. Laws, 286, it is provided: "All marriages within the degrees of consanguinity or affinity, according to the table established by law, are hereby declared void to all intents and purposes; and it shall and may be lawful for the Courts of Common Pleas of this Commonwealth, or any of them, to grant divorces from the bonds of matrimony in such cases; and the parties shall be subject to the like penalties as are contained in the act against incest; but when any of the said marriages shall not have been dissolved during the lifetime of the parties, the unlawfulness of the same shall not be inquired into after the death of either the husband or wife."

It might be well, in considering this statute of 1815, to make reference to the Act of March 31, 1860, P. L. 382, which is as follows: "If any person shall commit incestuous fornication or adultery, or intermarry within the degrees of consanguinity or affinity according to the following table established by law, he or she shall, on conviction, be sentenced to pay a fine not

exceeding five hundred dollars and to undergo an imprisonment by separate or solitary confinement at labor not exceeding three years; and all such marriages are hereby declared void. . . ." In that table the marriage of a woman with her father's brother is within the degree of consanguinity.

If, therefore, the marriage of the libellant and respondent had taken place within the confines of the Commonwealth of Pennsylvania, there is no doubt that it would have been a void marriage. It is also settled law in England and in several of the United States that a party to an incestuous marriage is not barred of the right to a divorce, because the marriage was knowingly and wilfully contracted: Andrews v. Ross, L. R., 14 Prob. Div. 15; Miles v. Chilton, 1 Robertson's Ecclesiastical Reps. 684; Martin v. Martin, 54 W. Va. 301; Stapleberg v. Stapleberg, 77 Conn. 31.

In the case of McClain v. McClain, 40 Pa. Superior Ct. 248, the question was raised as to whether a person having knowledge of the illegality of the marriage could take advantage of that illegality in an action for divorce under the Act of 1815. Henderson, J., on page 251, said: "As no such restriction is found in the Act of 1815, the fact that the libellant knew of the kinship existing is not a bar to this proceeding. The marital relationship of the libellant with the respondent cannot be continued lawfully, and the policy of the law should be to permit them to undo the wrong committed. Such is the view taken in England, as shown in Andrews v. Ross, L. R., 14 Prob. Div. 15, which was decided under the matrimonial causes act of 1857: Miles v. Chilton, 1 Robertson's Ecclesiastical Reps. 684; Johnston v. Parker, 3 Phil. 39. The same conclusion was reached in Martin v. Martin, 54 W. Va. 301, and in Stapleberg v. Stapleberg, 77 Conn. 31. Our own view of the case is in harmony with the practice so declared. The appellant ought not to be condemned to continue in a relationship which the law forbids and for the discontinuance of which it has made provision. Our conclusion is that the appellant has persented a case entitling her to relief."

In determining the validity of a marriage which took place outside of the boundaries of Pennsylvania, reference must be had not only to the laws of this Commonwealth, but those of the several states, as well as the laws of England. Generally, a marriage which is contracted is valid everywhere. This is so in some cases where the parties went into a foreign country with the intention to evade the laws of their own country. This latter principle is repugnant to the general policy of law relating to contracts, for in contracts a fraudulent evasion of the laws of the state of the parties to an agreement will not be permitted.

In the case of Inhabitants of Medway v. Inhabitants of Needham, 16 Mass. 157, Chief Justice Parker (page 161) said: "If without any restriction, then it might be that incestuous marriages might be contracted between citizens of a state where they were held unlawful and void in countries where they were not prohibited; and the parties return to live in defiance of the religion and laws of their own country. But it is not to be inferred from a toleration of marriages, which are prohibited merely on the grounds of political expediency, that others, which would tend to outrage the principles and feelings of all civilized nations, should be countenanced."

In the case of Jane Parker's Appeal, 44 Pa. 309, an uncle and niece married in the year 1856, and it not being made public, remained undissolved until his death in 1861. Jane Parker then applied for letters of administration on his estate. The question arose as to whether or not the niece was legally married to John J. Parker, deceased. In that case it was stated that by the law of England the intermarriage of uncle and aunt with the cor-

responding relationship of nephew and niece is prohibited, the reason assigned being that, as an uncle or aunt descends from the common ancestor equally with the father or mother of the nephew or niece, a character of similar respect and authority is thereby acquired which creates a reciprocity of duties scarcely inferior to those existing between parent and child, and, therefore, inconsistent with the equality of marriage. The Act of 1705, against incest, forbade such a marriage, and declared it void to all intents and purposes; the governor was authorized to grant a divorce from the bonds of matrimony, and the parties were fined to one-third part of the value of their estates.

Regarding the provisions of the Act of March 13, 1815, Read, J., on page 312, said: "Whatever may have been the language of the former acts, it is clear that this provision puts such marriages upon the same footing as similar marriages were in England. The marriages were not void, but voidable, and if not dissolved in the lifetime of the parties, their validity could not be questioned after the death of either."

The interpretation placed in this case upon the Act of 1815 was to the effect that since the act of assembly especially provided that if the marriage was not dissolved during the lifetime of the parties, the unlawfulness of the same could not be inquired into after the death of either husband or wife, that provision made a marriage contracted contrary to the terms of the act voidable and not void. Judge Read further said: "It is proper, however, to state that by the Statute 5 & 6 Wm. 4, c. 54, § 2, all future marriages between persons within the prohibited degrees either of affinity or consanguinity are declared absolutely null and void to all intents and purposes whatsoever. If such had been the terms of our enactment, it is clear that this marriage would have been not voidable, but void, and in such case Mrs. Parker would not have been the widow of the deceased."

The real test seems to be as to whether such an act of assembly, affecting the relationship of marriage between parties of a certain degree of consanguinity or affinity, is merely ceremonial. There is no doubt that a state may make laws affecting the marriages between certain designated classes of people. Without implying that the marriage inhibited is either unnatural or incestuous, this kind of legislation is actuated from a motive of public policy. Therefore, the controlling factor in the case is as to whether or not the marriage contracted is against public policy merely, or incestuous. In the former case such legislation could have no extra-territorial effect. In the event of a marriage by citizens of this Commonwealth in some other jurisdiction where the same could be legally entered into and their return to this Commonwealth, this State would recognize the marriage contracted in the other state.

Incest is contrary to the principles of Christianity just as much as is polygamy, and an incestuous marriage will be void in any Christian country, it being forbidden by the Divine law: Story on Conflict of Laws, § 114.

In the case of Schofield *v.* Schofield, 51 Pa. Superior Ct. 564, Porter, J. (page 569), speaking upon the effect of an act of legislation and its operation upon foreign laws, said: "Within the limits imposed by the Constitution of the United States, 'a state may prohibit the operation of all foreign laws, and the rights growing out of them, within its own territories. It may prohibit some foreign laws, and it may admit the operation of others. It may recognize and modify and qualify some foreign laws; it may enlarge or give universal effect to others. It may interdict the administration of some foreign laws; it may favor the introduction of others. When its own code speaks positively on the subject, it must be obeyed by all persons who are within the reach of its sovereignty. When its customary, unwritten, or common law

speaks directly on the subject, it is clearly to be obeyed; for it has an equal obligation with its positive code.' "

On page 570, quoting from Story on Conflict of Laws, Judge Porter said: "When a nation, or state, by statute prohibits one of its subjects or a class of such subjects to contract matrimony, generally and in the abstract, employing in the statute language sufficiently indicating the intention to impose a personal incapacity to contract marriage either within or without the realm, or by statute prohibits marriages between persons related in a certain degree expressly upon the ground that such marriages are 'contrary to God's law,' and a subject of such nation marries in violation of such prohibition, while in a foreign country where the marriage is lawful, such marriage will upon the return of the person to his own domicile be held invalid by the courts of that domicile." In that case reference was further made to an act of assembly relating to the prohibition of marriage of a husband and wife who had been guilty of adultery, and the court, on page 572, said: "The leading case in Pennsylvania in which this second exception to the general rule has been recognized and applied, and a statute of the state given an extra-territorial effect, is Stull's Estate, 183 Pa. 625. The court in that case construed the Act of March 13, 1815, P. L. 286, which forbids the husband or wife who has been guilty of the crime of adultery to marry the person with whom the said crime was committed during the life of the former husband or wife. The court held that the language of the statute clearly indicated that the legislative intention was to forbid the marriage relation to be contracted; that it was aimed at the existence of the marriage state between the parties. Mr. Justice Green, who spoke for the court, said: 'A personal incapacity to marry is imposed. The necessary meaning of this language is that they shall not marry at all, in any circumstances, or at any time, or any place, so long as the injured party is living. So far as the purpose and meaning of this statute are concerned, it is of no consequence where such subsequent prohibited marriage takes place. The relation itself is absolutely prohibited, and, hence, is within the operative words of the statute, without any reference as to where the marriage occurs.' The court further held that the prohibition of the state, there involved, embodied a distinctive state policy as affecting the morals and good order of society. The parties in that case were subject to the prohibition and were domiciled in Pennsylvania; they went into another state where they might lawfully be married, and were there married and immediately returned to their Pennsylvania domicile. The marriage was judged to be of no effect. Each separate nation, or state, must determine for itself what shall be regarded as immorality. That is *contra bonos mores* which in any particular country, or among the people of that country, is of such evil example as to shock the general public sentiment."

If, therefore, with few exceptions, such a marriage is prohibited in these United States as well as in England, surely not merely upon the grounds of expediency or upon some moral grounds, but upon the basic principle that such a marriage would tend to outrage the principles and the doctrines upon which this civilization is founded, in that event this Commonwealth, by its legislation, may prohibit such incestuous marriage, no matter where consummated.

It was held in the case of United States ex rel. Devine *v.* International Navigation Co. et al., 10 Dist. R. 480: "That as, under the laws of Pennsylvania, such a marriage (between uncle and niece) was unlawful and void, and the parties would be liable to prosecution, the United States courts would not recognize it as valid; that the relators should be remanded for deportation."

The court there held that this was an exception to the rule laid down by the Constitution that full faith and credit shall be given to the laws of the other states.

It has been held in the case of Foust v. Foust, 14 Pa. Justices' Law Repr. 10, that the allegations of desertion and incestuous marriage in the one and same libel are not incompatible. Since they are not incompatible, the libel may be amended for the purpose of adding as a cause of action incest.