### Weiss v. Weiss.

*Divorce — Annulment of incestuous marriage, although performed in another state in which the marriage was lawful—Act of March 13, 1815, 6 Sm. Laws, 286.*

1. Where a citizen of Pennsylvania and resident of Philadelphia marries his half-brother's daughter, a citizen of New York, the marriage being performed at Providence, R. I., where the ceremony was lawful, and after the marriage the couple return to Philadelphia to live, the marriage being incestuous in Pennsylvania, will be annulled by a Pennsylvania court having jurisdiction of the parties.

2. The rule that the application for annulment must be made by the innocent and injured party does not apply in such cases.

Divorce.  C. P. No. 5, Phila. Co., June T., 1924, No. 942.

*S. J. Randall,* for libellant; *J. J. Murphy,* for respondent.

SMITH, J., Dec. 6, 1926.—This is an action in divorce wherein the master has made a recommendation that a decree in divorce be granted.

When the action was commenced by the filing of the libel in divorce, the cause of action therein mentioned was desertion. The libel was afterward amended by adding, as a ground for divorce, the consanguinity of the parties.

The libellant, who is the blood half-brother of the respondent's father, married the respondent May 20, 1920, at Providence, Rhode Island. At that time the libellant was a citizen and resident of the City of Philadelphia, Commonwealth of Pennsylvania, and the respondent had been a citizen of the State of New York. Subsequently, both the parties established their domicile and resided in the City of Philadelphia. When this marriage relation was

entered into, the libellant was about fifty years of age and the respondent about ten years his junior. The only offspring as a result of this marriage was born dead, so that there are no children. The master had a great number of meetings and has very thoroughly covered the question involved. There are a great many contradictions in the testimony as to the desertion, and the master, therefore, finds that that cause of action has not been proved. On the question of consanguinity, the master found that there was ample evidence to justify the recommendation for a divorce.

It is shown by the testimony that, prior to the marriage, the libellant and respondent contemplated the establishing of their domicile and residence in the home of the libellant in the City and County of Philadelphia, Commonwealth of Pennsylvania, immediately after the marriage ceremony was performed. The libellant had been married before, his first wife dying in 1919. Having decided to marry, they went to the marriage license bureau in City Hall, in the City and County of Philadelphia, and were there informed, because of their relationship of uncle and niece, that they could not be lawfully married in this Commonwealth. They, therefore, went to the City of Providence, State of Rhode Island, and were married and immediately returned to the City of Philadelphia and took up their common residence at No. 5825 Hadfield Street, in said city. From that time on there were many serious differences. There is evidence of considerable domestic discord and disagreements, which finally terminated on Oct. 27, 1921, in the respondent leaving the home of her husband never again to return, except one time, when she came back to get her personal belongings.

The master finds, as a conclusion of law and by reason of the prohibited degree of consanguinity of uncle and niece, that the purported marriage of the libellant and respondent was void ab initio.

This is an exception to the rule that the validity of a marriage is determined by the law of the place where it was contracted. Incest in the case of a marriage may be repugnant to the public policy of the state in which the parties to such marriage may make their domicile and may be contrary to the positive laws of that state. This is a reasonable exercise of the police power of a sovereign state, and is, therefore, not an impairment of the constitutional provision that one state should give full faith and credit to the laws of other states. The police powers of each state over matters strictly intrastate are supreme. "Incest is defined as sexual intercourse, either under form of marriage or without it, between persons too nearly related in consanguinity or affinity to be entitled to intermarry. Marriage between persons nearly related is prohibited in every Christian country, and incest has been forbidden to some extent by general custom from the earliest times, and by people very little advanced in civilization:" 14 Ruling Case Law, 29.

Story on Conflict of Laws, § 114, also says: "Incest is contrary to the principles of Christianity, just as much as is polygamy and an incestuous marriage will be void in any Christian country, it being forbidden by the Divine law."

The English Court of Appeals has announced the principle that the personal capacity to marry must depend on the law of the domicile.

In Sottomayor v. De Barros, 3 Probate Division, 1, English Ruling Cases, 814, Cotton, L. J., said: "It is a well recognized principle of law that the question of personal capacity to enter into any contract is to be decided by the law of the domicile. It is, however, urged that this does not apply to the contract of marriage, and that a marriage valid according to the law of the country where it is solemnized is valid everywhere. This, in our opinion, is

not a correct statement of the law. The law of a country where a marriage is solemnized must alone decide all questions relating to the validity of the ceremony by which the marriage is alleged to have been constituted; but, as in other contracts, so in that of marriage, personal capacity must depend on the law of domicile; and if the laws of the country prohibit its subjects within certain degrees of consanguinity from contracting marriage, and stamp a marriage between persons within the prohibited degrees as incestuous, this, in our opinion, imposes on the subjects of that country a personal incapacity, which continues to affect them so long as they are domiciled in the country where this law prevails, and renders invalid a marriage between persons both at the time of their marriage subjects of and domiciled in the country which imposes this restriction, wherever such marriage may have been solemnized."

So, also, in Brook *v.* Brook, 9 House of Lords, 193, English Ruling Cases, 783, where Lord Campbell said: "There can be no doubt of the general rule that a foreign marriage, valid according to the law of the country where it is celebrated, is good everywhere. But while the forms of entering into the contract of marriage are to be regulated by the *lex loci contractus*, the law of the country in which it is celebrated, the essentials of the contract depend upon the *lex domicilii*, the law of the country in which the parties are domiciled at the time of the marriage, and in which the matrimonial residence is contemplated. Although the forms of celebrating the prior marriage may be different from those required by the law of the country of domicile, the marriage may be good everywhere. But if the contract of marriage is such, in essentials, as to be contrary to the law of the country of domicile, and it is declared void by that law, it is to be regarded as void in the country of domicile, though not contrary to the law of the country in which it was celebrated."

A later decision in Ogden *v.* Ogden (1908), English Probate, 46, the same English Court of Appeals, following the rule of *stare decisis*, confined the application of the above principle to cases in which both of the contracting parties were, at the time of the marriage, domiciled in a country, the laws of which prohibited their marriage. Subsequently affirmed in 3 Smale & Giffard (Chancery Division), 481, 65 Reprint, 746; Fenton *v.* Livingston 3 Macqueen, House of Lords, Scotland, 497, and in Mette *v.* Mette, 1 Swabey & Tristram, 416, 164 Reprint, 792.

The rule, as enunciated in the English decisions cited, is followed practically by all the courts in this Commonwealth. The positive law upon this subject is stated in the Act of March 13, 1815, 6 Sm. Laws, 286, as follows: "All marriages within the degrees of consanguinity or affinity, according to the table established by law, are hereby declared void to all intents and purposes; and it shall and may be lawful for the Courts of Common Pleas of this Commonwealth, or any of them, to grant divorces from the bonds of matrimony in such cases; and the parties shall be subject to the like penalties as are contained in the act against incest; but when any of the said marriages shall not have been dissolved during the lifetime of the parties, the unlawfulness of the same shall not be inquired into after the death of either the husband or wife."

That consanguinity is repugnant to the positive laws of this Commonwealth is illustrated by the Act of March 31, 1860, P. L. 382, which provides as follows: "If any person shall commit incestuous fornication or adultery, or intermarry within the degrees of consanguinity or affinity according to the following table, established by law, he or she shall, on conviction, be sentenced

to pay a fine not exceeding five hundred dollars and to undergo an imprisonment by separate or solitary confinement at labor, not exceeding three years; and all such marriages are hereby declared void."

In the table of degrees of consanguinity the act prohibits a woman from marrying her father's brother: United States ex rel. Devine et al. v. Rodgers, Commissioner of Emmigration, 109 Fed. Repr. 886.

This case was decided by J. B. McPherson, District Judge for the Eastern District of Pennsylvania. There, a marriage by a Russian with his niece, though lawful in Russia, was not recognized as valid in Pennsylvania, where a continuance of the relation would expose the parties to indictment in the criminal courts. The court said: ". . . Where the ceremony took place, it has been satisfactorily proved that a marriage between uncle and niece is lawful, and being valid there, the general rule undoubtedly is that such a marriage would be regarded everywhere as valid. But there is this exception, at least, to the rule: If the relation thus entered into elsewhere, although lawful in the foreign country, is stigmatized as incestuous by the law of Pennsylvania, no rule of comity requires a court sitting in this State to recognize the foreign marriage as valid."

Later, in Com. v. Reigel, 22 Dist. R. 903, a case in which a criminal prosecution arose out of a marriage between the defendant and a woman who was a half-sister of defendant's father (having a common mother), the court, in sustaining the conviction for incestuous fornication, held that a marriage prohibited and punished by our laws as against good morals and contrary to public policy, and entered into by citizens of this State going into another for that purpose and returning after its consummation, is not entitled to a recognition as the basis of a lawful relation in this State.

Thus, it seems clear that the fact that the libellant and respondent in this case left their marital domicile for the purpose of evading its laws does not alter the rule nor bar a divorce.

In the case of McClain v. McClain, 40 Pa. Superior Ct. 248, the libellant and respondent were first cousins, and by the Act of June 24, 1901, P. L. 597, first cousins were added to the classes of persons between whom a marriage was incestuous and void. The court said, inter alia: "The fact of the relationship is clearly shown, and the appellant desires to be relieved from the effect of a marriage contract which, since her marriage, she has found to be unlawful and criminal. The learned judge of the court below was influenced in entering a decree against the libellant by the consideration that she was not 'an innocent or injured party,' and concluded that where both of the parties contributed to the illegal marriage and had equal grounds for a divorce, the court would withhold the decree, leaving them to make the best of the status created by themselves. The Act of 1815 makes no reference to 'an innocent or injured party,' however. The section providing for annulling incestuous marriages was intended to enable the parties to rectify, as far as possible, the wrong done to relieve society from the odium of such an illegal relationship. Either party was given a place of repentance and an opportunity to make restitution."

But in Schofield v. Schofield, 51 Pa. Superior Ct. 564, a later case, the court held, under somewhat similar circumstances, that the marriage is not rendered void. There, however, the facts were that a marriage was contracted between first cousins in the State of Delaware, the parties were domiciled in Pennsylvania, and, knowing the statute of Pennsylvania prevented their being joined in marriage, left that state for the purpose of being married in the State of Delaware, and, after the ceremony, returned to their Pennsylvania

domicile and continued to reside there. Nevertheless, the court, in disagreeing in part with the ruling of McClain *v.* McClain, 40 Pa. Superior Ct. 248, contended that marriages between first cousins have never been considered incestuous in Pennsylvania. The Act of June 24, 1901, P. L. 597, they declared to be not a penal statute, but merely an act which made it unlawful for any male person and female person who were of the kin of the degree of first cousins to be joined in marriage, and did not make the marriage relationship or the status of marriage between cousins unlawful and void, but only prohibited the celebration of such a marriage in Pennsylvania.

"Brother," as used in the Act of March 31, 1860, P. L. 393, includes "brother by the half-blood." See Com. *v.* Reigel, 22 Dist. R. 903.

As has been well stated by the learned master, the reason for such legislation is apparent. He states: "In this State, the illegality of those marriages contracted between uncle and niece rest on the ground that such unions are against the laws of God, are immoral and destructive of the purity and happiness of domestic life. The objection to such marriages is founded in reason and nature. It grows out of the institution of families and the rights and duties, habits and affections, flowing from that relation which may be justly considered as part of the law of our nature, as rational and social beings. Marriages among such near relations would lead to domestic licentiousness, and, by blending, in one object, duties and rights incompatible with each other. Such a status would undoubtedly perplex and confound the duties, habits and affections proceeding from the family state, impair the perception and corrupt the purity of moral state, and do violence to the moral sentiments of mankind."

The recommendation of the learned master is hereby approved and exceptions filed on behalf of the respondent are dismissed. Divorce granted.