## In re Enderle Marriage License

*Abe Lapowsky*, for applicants.

KLEIN, P. J., and LEFEVER, J., July 15, 1954.— Frank Enderle and Adelheid Enderle have applied for a marriage license. Applicant, Frank, was adopted by Frank Enderle and Elizabeth Enderle, his wife, by decree of the Probate Court of Cuyahoga County in the State of Ohio, entered January 15, 1927, as of docket 198, no. 161210. Frank is not related by blood to his adoptive parents. Adelheid is the daughter of a brother of the adopting father.

We are asked to decide whether a marriage license should be issued to this couple who are not related by blood, but who are first cousins by adoption.

From earliest days, the marriage of persons related within certain degrees, whether by consanguinity or

by affinity, has been prohibited. This restriction is of biblical origin, arising from the injunction against incest, found in the Book of Leviticus XX: 11-21.

In Bouvier, Law Dictionary (Rawle's 3d rev., 1914), pp. 159-60, affinity is defined as "the connection existing, in consequence of marriage, between each of the married persons and the kindred of the other". It is distinguished from consanguinity, which denotes relationship by blood, or descent from a common ancestor.

Vernier, in American Family Laws, vol. 1, states at page 173:

"In the early history of England, marriage was under ecclesiastical control, and the canon law was the source of the rules declaring what classes of persons should be prohibited from marrying on account of relationship by consanguinity or affinity. The ecclesiastical law originally followed the Jewish law as set out in the Old Testament, and prohibited to an equal degree the marriage of persons related by consanguinity and affinity. Previous to the time of Henry VIII, disqualification because of relationship had been extended beyond all reasonable limits, and at that time the statute of 32 Hen. VIII, c. 38, was passed. This forbade the ecclesiastical courts from invalidating any marriage unless the parties were more closely related than first cousins." *

The marriage of first cousins was not forbidden at common law and is lawful, and not held to be incestuous, in most of the States of the United States.

In Pennsylvania the first prohibition against the marriage of first cousins is found in the Act of June 24, 1901, P. L. 597, 48 PS §§165-166. It was reënacted in the Marriage Law of August 22, 1953, P. L. 1344, in which the laws relating to marriage were revised

---

* For an interesting discussion of this subject generally, see Freedman on Marriage and Divorce, vol. 1, p. 411 et seq.

and consolidated. Section 5(1) of that statute provides that no license shall be issued by any clerk of the orphans' court to applicants within certain degrees of consanguinity and affinity, listed separately in the section. First cousins are included in the list of prohibited degrees of consanguinity but omitted from the list of forbidden degrees of affinity.

Ordinarily the validity of a marriage between persons who are sui juris is decided by the law of the place where it is celebrated. If valid there, it is valid everywhere. If, however, the marriage is basically immoral, as, for example, when it is incestuous or contrary to God's law, this rule does not apply. In Schofield v. Schofield (No. 1), 51 Pa. Superior Ct. 564 (1912), the court held that the marriage of first cousins, residents of Pennsylvania, who were married in another State, where such marriages were permitted, was not an exception to the general rule and, accordingly, was not rendered invalid upon return to their Pennsylvania domicile.

It is evident that the marriage of first cousins has been regarded historically as in a different category from that of persons more closely related.

It would appear at first blush that there is no reason to prevent the marriage of these applicants, since their relationship arises from adoption and is not based on consanguinity. There are, however, other complex facets inherent in this problem, and the precise question presented to us is apparently one of first impression in this country.

The adoption of a child is purely statutory in origin and creates an entirely new status which did not exist at common law.

In Schwab Adoption Case, 355 Pa. 534, 536 (1947), our Supreme Court said:

"Adoption is a practice which was recognized by the civil law from its earliest date, but was unknown

to the common law of England. It exists in the United States solely by virtue of statute. The first statute of adoption in this Commonwealth was the Act of May 4, 1855, P. L. 430: Chief Justice Sharswood in Ballard v. Ward, 89 Pa. 358, 362; President Judge Rice in Evan's Estate, 47 Pa. Superior Ct. 196, 198. See Carroll's Estate, 219 Pa. 440, 68 A. 1038."

To the same effect, see Thompson's Adoption, 290 Pa. 586, 590 (1927).

It requires little research to recognize that the practice of adopting children is being regarded with increased approval by the community at large. Adoptions are now viewed with such favor in this State that the Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §601, provides in article VIII, sec. 101, that the words "child" or "children", when used in any law, shall include children by adoption as well as children by birth, unless the context clearly indicates otherwise.

In line with this liberal trend, an adopted child and the adoptive parent are generally in the same status as a child and a natural parent for all purposes of inheritance: Intestate Act of April 24, 1947, P. L. 80, sec. 8. An adopted child is entitled to the same benefits as a natural child under the Workmen's Compensation Law of June 2, 1915, P. L. 736, 77 PS §562, and is required to pay only the direct rate of 2 percent, and not the collateral rate of 15 percent, on estates passing from the adoptive parent: Act of December 21, 1951, P. L. 1713, 72 PS §2302. Conversely, an adopted child is liable for the support of an indigent adoptive parent under The Support Law of June 24, 1937, P. L. 2045, sec. 3(a): Commonwealth v. Chiara, 60 D. & C. 547 (1947).

Much has been written concerning the legal effect of an adoption which, if read literally, would suggest that an adopted child has exactly the same status as

a natural child for all purposes. For example, in Schwab Adoption case, supra, the court said, at page 536:

"In Pennsylvania a valid adoption severs the child from its natural family tree and engrafts it upon that of its new parentage. Thereafter the child attains the status, in law, of a natural child of the adopting parents: Cave's Estate, 326 Pa. 358, 192 A. 460."

The biological facts of life are immutable, however, and while the State can change the legal relationships of its citizens, no legislative fiat can alter their blood relationships.

Although the status of adoption confers the incidents of the relationship of parent and child upon the adoptive parent and the adopted child, this does not ordinarily extend to the relatives of the adoptive parent: 2 C. J. S. 449.

In Cave's Estate, 326 Pa. (1937), Mr. Justice Stern (now Chief Justice) said at page 359:

"The right of adopted children to inherit from kindred of their adoptive parents is dependent entirely upon statutory enactments, and because the 'call of the blood' is one of the most firmly rooted instincts of human nature, courts tend to a strict construction of such legislation. In the absence of a plain legislative mandate to the contrary a stranger to the adoption proceedings should not have his property diverted from its natural course of descent to the heirs of his blood; therefore, a statutory grant to adopted children of the right to inherit from their foster parent does not necessarily carry with it the right to inherit from the latter's collateral relatives. However, it must be conceded to be within the legislative power to confer such a right upon an adopted child, and the problem in the present case is to ascertain whether the statutory law of the state is properly to be construed as having granted it."

Again, in speaking of the application of the effect of the transfer inheritance tax laws upon benefits received by adopted children from the estate of the father of their adoptive parent, Chief Justice Stern said in Strunk Estate, 369 Pa. 478, 481 (1952):

"However, while these statutes progressively enlarged the rights of adopted children to inherit from and through their adopting parent, they could not, of course, actually make such children children of his blood and therefore his 'lineal descendants'. What they accomplished was to establish a certain relation between the adopted child, the adopting parent, and their respective relatives, for specified purposes, but nowhere therein is there any suggestion of an intention to affect the Commonwealth in regard to its tax legislation. As the Commonwealth properly contends, adoption creates an artificial relation between the adopting parent and the adopted child conferring certain rights and imposing certain duties upon each, but in respect to the Commonwealth's tax laws it is without effect in the absence of express provision to the contrary."

If an adopted child is to be regarded literally as the natural child of his adoptive parent, it would follow that sexual intercourse between them would constitute the crime of incest. Although this question has apparently never been decided in Pennsylvania, the courts in at least three other States have decided that the incest statutes apply only to persons related by blood and not to persons whose relationship arises from adoption.

In State v. Lee, 196 Miss. 311 (1944), the court held that the meaning of daughter, as commonly used, is the female offspring of a man or a woman, i.e., an immediate female descendant and that adultery or fornication with one's adopted daughter is not punish-

able as incest under a statute referring to daughter. The court, in its opinion, said:

"It is, therefore, for the legislative department to include an adopted daughter by a plain statute, fixing the punishment, not for us to engraft it or read it into one of the existing statutes by way of construction. . . ."

See, also, People v. Kaiser, 119 Cal. 456, 51 Pac. 702 (1897) ; Ohio v. Youst, 74 Ohio App. 381 (1943).

If we decided that adoption literally removes a child from the family of his natural parent and engrafts him for all purposes upon the family of his adoptive parents, we might be compelled to conclude that an adopted child was free to marry his natural sister or even his own mother. Certainly, such an immoral and shocking result was not intended or contemplated by the legislature.

"The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature," and this may be ascertained "by considering, among other matters—(1) the occasion and necessity for the law; . . . (3) the mischief to be remedied; (4) the object to be attained; . . .": Statutory Construction Act of May 28, 1937, P. L. 1019, art. IV, sec. 51.

The purpose of the legislature in prohibiting marriages within certain degrees of consanguinity and affinity is at least threefold: (1) To maintain the Divine Law forbidding the marriage of close relatives; (2) for eugenic reasons, to preserve and strengthen the general racial and physical qualities of its citizens by preventing inbreeding, and (3) to maintain the sanctity of the home and prevent the disastrous consequences of competition for sexual companionship between members of the same household or family.

Keeping before us the historical background of legislation dealing with the marriage of first cousins, the fact that the prohibition against the marriage of first cousins in the Marriage Law is contained only in the list referring to degrees of consanguinity, leads us to the inescapable conclusion that the legislature intended the prohibition to include only first cousins related by blood and not those whose relationship is based on adoption.

We refrain, however, from expressing in this opinion our views with respect to marriage involving relationship by adoption closer than first cousins.

We, therefore, enter the following

### Decree

And now, July 15, 1954, it is ordered and decreed that a marriage license be issued to Frank Enderle and Adelheid Enderle.