## Jacobsen Marriage License

LEFEVER and SHOYER, JJ., February 1, 1957.—The question before the court is whether first cousins once removed are prohibited from marrying in Pennsyl-

vania. The applicants, Carl W. Jacobsen and Inge Jacobsen, having been refused a license to marry by the clerk of this orphans' court solely on the ground that they were related within the prohibited degrees of consanguinity, an appeal was forthwith taken to the court under sec. 9 of The Marriage Law of August 22, 1953, P. L. 1344, 48 PS §§1-1 to 1-25.

From the earliest times marriages in this State have been prohibited within certain close degrees of consanguinity and affinity. In our present marriage law these restrictions are set forth in a table in sec. 5($i$). The prohibited degrees of consanguinity are as follows:

"A man may not marry his mother.

"A man may not marry his father's sister.

"A man may not marry his mother's sister.

"A man may not marry his sister.

"A man may not marry his daughter.

"A man may not marry the daughter of his son or daughter.

"*A man may not marry his first cousin.*

"A woman may not marry her father.

"A woman may not marry her father's brother.

"A woman may not marry her mother's brother.

"A woman may not marry her brother.

"A woman may not marry her son.

"A woman may not marry the son of her son or daughter.

"A woman may not marry her first cousin." (Italics supplied.)

From the written application for the license and from the testimony of the parties, it appears that Carl W. Jacobsen, the male applicant, is a first cousin of Gunnar Jacobsen, father of the female applicant. Their respective fathers were brothers of the full blood and the two first cousins thus had a common grandfather, Carl Jacobsen. He was also the great-grandfather of

Inge Jacobsen, the female applicant. Her relationship to the male applicant is that of a first cousin once removed.

The restrictions against marriage within certain degrees of consanguinity or affinity are of biblical origin arising from the injunction against incest, found in the Book of Leviticus, chs. 18 and 20: In re Enderle Marriage License, 1 D. & C. 2d 114, 115. "At common law there were two kinds of disabilities affecting the validity of the marriage relation. The first were termed canonical, depending on the law of the, church and enforced in the ecclesiastical court. Among these were consanguinity and affinity. . . . The second kind were civil disabilities, such as a prior marriage, infancy, idiocy, lunacy, fraud or force. . . . In this state there are no merely canonical disabilities; for the canons of no church are of any binding force, nor are there any ecclesiastical courts to pass sentence upon offenders *pro salute animarum*. Consanguinity and affinity within the prohibited degrees are civil disabilities by force of express statute, and make the marriage null and void without decree of divorce, except as otherwise provided": Walter's Appeal, per Sharswood, J., 70 Pa. 392, 393.

The marriage of first cousins was not forbidden at common law; it has been held not incestuous, but lawful, in most of the States of the United States, as well as in England, Scotland, Ireland and the Protestant countries of continental Europe: Schofield v. Schofield (No. 1), 51 Pa. Superior Ct. 564, 569; Story on Conflict of Laws, sec. 114. In this Commonwealth the earliest prohibition against the marriage of first cousins is found in the Act of June 24, 1901, P. L. 597, 48 PS §§165, 166, repealed and supplied by our Marriage Law of 1953, in sec. 24 and sec. 5(*i*) above.

The present question for decision is whether the quoted prohibition that "A man may not marry his

first cousin" is to be construed as prohibiting him from marrying a blood relative one degree further removed, that is, the daughter of his first cousin. Reference to the above table clearly indicates that the legislature limited the restrictions of consanguinity to first cousins. In the line immediately preceding the first cousin restriction, it is stated that "A man may not marry the daughter of his son or daughter", i.e., his grandchild. The legislature would unerringly have continued on another line and provided that a man may not marry the *daughter of his first cousin*, had that been the legislative intention. Well settled rules of statutory construction require that the court not extend the area of prohibited relationships.

The case law dealing with the Act of 1901, and the Penal Codes of Pennsylvania, past and present, substantiate this view. In a well considered master's report filed by Honorable Samuel W. Pennypacker, former Governor of Pennsylvania, in the case of Schofield v. Schofield, supra, reported in 20 Dist. R. 805, it was stated that there was nothing in the statute of 1901 to indicate that the object of the prohibition was the maintenance of good morals. The learned master wrote, page 810:

"There is nothing in the Act of 1901 which imposes either fine or imprisonment. The word incest is nowhere used in it, and it contains no language from which an intention to create a new crime can be inferred. Nor is it too much to expect that if such an intention had existed, it would have been expressed in language about which there could be no mistake. Moreover, we can go much further and affirm that there is nothing in it to indicate that the object of the prohibition is the maintenance of good morals. No such purpose is expressed, and there is a provision of the statute which seems to show conclusively that the question of good morals did not enter into consideration.

It was approved on June 24, 1901, but by its terms did not go into effect until Jan. 1, 1902, and therefore the joining in marriage of first cousins was expressly approved and recognized as valid for the intervening period. Such a state of affairs surely would not have occurred if these marriages were regarded as contrary to good morals. The same facts cannot be in accord with good morals from June to January and be in conflict with them from January to June thereafter."

Governor Pennypacker concluded that the legislature in passing the Act of 1901 was influenced by some scientific theory of physical consequences since it could not be based on the theory of the maintenance of good morals. His report was approved by the lower court, which was upheld by the Superior Court, the latter stating that this statute "cannot be taken as a declaration that the marriage status between first cousins is either contrary to the Divine law or immoral": 51 Pa. Superior Ct. 564, 578, allocatur refused XXXVI.

The marriage of first cousins was never made a crime under the Criminal Code of March 31, 1860, P. L. 382, the Act of 1901 above, nor The Penal Code of June 24, 1939, P. L. 872, 18 PS §4101 et seq. By sec. 507 of The Penal Code, 18 PS §4507, whoever intermarries "within the degrees of consanguinity or affinity, according to the following table, is guilty of incest, a felony . . .". The table of consanguinity in The Penal Code is set forth exactly as is the above quoted table except that all reference to the marriage of first cousins is omitted. This is further reason for holding that in passing The Marriage Law of 1953, the legislature intended to extend the prohibition of consanguineous marriages one degree beyond that set in The Penal Code, *but no further*. In addition, while prohibiting such marriages the legislature recognized that the offense to morals, which necessitated pronouncing

the marriage of closer kin incestuous and criminal, did not exist with regard to first cousins.

Since the marriage of first cousins is "neither criminal nor shocking to the moral sensibilities of the people of the Commonwealth" (Freedman on Marriage and Divorce, Vol. I, 426), we can safely conclude that the marriage of *first cousins once removed* is not objectionable, and was purposely not included in the prohibitions contained in The Marriage Law of 1953.

For the foregoing reasons, we enter the following

*Decree*

And now, February 1, 1957, it is ordered and decreed that a marriage license be issued to Carl W. Jacobsen and Inge Jacobsen.